197 N.J. Super. 2 (1984)
484 A.2d 13
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WAYNE LASSITER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1984.
Decided November 13, 1984.
*6 Before Judges ANTELL, J.H. COLEMAN and SIMPSON.
Robert J. Martin argued the cause for appellant (Joseph H. Rodriguez, Public Defender of New Jersey, attorney; Robert J. Martin of counsel and on the brief).
Patricia E. Stern, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Patricia E. Stern of counsel and on the brief).
The opinion of the court was delivered by, ANTELL, P.J.A.D.
After a trial by jury defendant was convicted of aggravated assault, N.J.S.A. 2C:12-1b(1)(2), and murder, N.J.S.A. 2C:11-3. The victim of both crimes was Josephine Branch, the assault occurring on July 17, 1982 and the murder on July 18, 1982. On the assault conviction, defendant was sentenced to a custodial term of ten years with parole ineligibility for five years and ordered to pay a penalty of $500. He was sentenced to a consecutive thirty year custodial term on the murder conviction with parole ineligibility for fifteen years and also ordered to pay an additional penalty of $500. On this appeal he alleges trial error and a manifestly excessive sentence.
According to the State's evidence, Josephine Branch worked for defendant as a prostitute. She had apparently determined to leave him and on Friday, July 16, 1982 he was engaged in a *7 search for her whereabouts in the City of Newark. He visited the Shalimar Hair Salon where he told Byron Richards that Branch had run off again, that he had too much invested in her and that when he caught her he was going to "kill the bitch." Defendant found Branch at 4:00 the following morning, Saturday, July 17, 1982, sharing the bed of a male companion in the latter's apartment. Defendant seized Branch, punched her and ordered her to get dressed. She put on her clothes and defendant then dragged her out into the hallway where he beat her with a shovel, leaving her blood on the floor of the hallway as they left the building. Branch was later admitted to the Harlem Hospital in New York City where she reported that she had suffered her injuries in a "mugging."
At around 5:00 or 6:00 p.m. of the same day defendant picked up Branch from the hospital where her head and leg had been sutured and bandages had been placed on her head, arm and leg. He then delivered her to her apartment on Elizabeth Avenue in Newark where he left her in the company of Towanda Whitfield. Whitfield had also been formerly employed by defendant. Defendant then left the apartment and returned the following morning, Sunday, July 18 at about 6:00 a.m. Whitfield testified that Branch's physical ordeal had weakened her to the point where she required assistance even to reach the bathroom.
When defendant returned to the apartment, Branch, who was a narcotics user, was in considerable pain and was asking for drugs. An argument developed between Branch and defendant, and Whitfield was ordered into another room of the apartment.
The events of the following period of approximately fifteen minutes were then recounted not only by Whitfield, but by a number of neighbors in the building. The words "bumping" and "thumping" were used to describe the sounds of a body repeatedly hitting the bedroom wall. In the melee, Branch's voice was heard screaming for help. She called for her mother, *8 screaming that she could not take it any more and that she was going to jump. The apartment was on the eleventh floor of the building. One witness, a retired Newark police officer, testified that she heard a voice from the Branch apartment saying, "help me, somebody help me. He is killing me. Call the police. Please make him stop." Another witness, whose apartment was directly above Branch's, heard the girl crying and saying, "you don't love me no more; I am going to jump," and a man's voice answering "go ahead and jump." Branch then threw herself out the window and her life ended on the ground below.
Defendant's contention which we first consider is that the trial judge erroneously permitted Byron Richards to testify that he had been shot in the back twice on November 5, 1982, some three days before the case was originally scheduled for trial. Citing Evid.R. 55, defendant argues that the testimony was evidence of "other crimes" which did not qualify for admissibility under that rule and, further, that the evidence fell short of demonstrating that defendant was responsible for the shooting.
The purpose of the testimony was to demonstrate defendant's determination to deprive the court of highly incriminating evidence. As such, it was clearly admissible as illuminating defendant's consciousness of his own guilt and on the theory that any conduct of the defendant inconsistent with his claim of innocence is admissible in evidence. See State v. Rechtschaffer, 70 N.J. 395, 413-415 (1976) and State v. Hill, 47 N.J. 490, 500-501 (1966). It was not subject to the restriction of Evid.R. 55, which only excludes evidence of other crimes as proof of defendant's "disposition to commit crime" as the basis for an inference that he committed the crime for which he was on trial.
Evidence that the shooting occurred at defendant's instigation was adequate. Commencing around the end of October 1982, defendant, both personally and through intermediaries, importuned Richards with offers of bribe money to make himself unavailable to the State when the case was moved for trial. *9 He was unquestionably anxious about Richards' testimony and, in fact, told Richards, not to worry "because I am going to take care of all of this." This argot was interpreted by Richards as meaning "that he might be sending someone to get me." Defendant here complains that the jury should not have been allowed to hear this comment since those words, taken in their ordinary sense, did not convey the intent or purpose which Richards attributed to them. We disagree. An understanding of the words spoken by defendant did not lie beyond the understanding of lay people and the jurors were not bound by the witness' understanding. They were inextricably related to the context within which the two men were carrying on their discussion and the jury was free to decide for itself the extent of their ambiguity and whether defendant was expressing a covert threat.
Also connecting defendant to the shooting is Richards' response on cross-examination by defendant to the question, "Who shot you?" His answer was "Wayne's partner, Rob."
Finally, as to this issue, we observe that the State declared in its opening statement to the jury that the proofs would show that Richards had been offered a bribe which he did not accept and was thereafter shot. This was not then objected to by defendant. Instead, he accepted the challenge and in his opening statement told the jury that "the evidence will also show you that Wayne Lassiter had nothing to do with Shampoo [Richards] getting shot; that nobody knows who shot Shampoo; that Shampoo does not know who shot him." A hearing was not requested under Evid.R. 8; instead, defendant made the strategic decision to meet this factual contention on the evidence. This aspect of the case developed with the acquiescence of the defendant and may not provide the basis for a reversal on appeal. State v. Harper, 128 N.J. Super. 270, 277 (App.Div.), certif. den. 65 N.J. 574 (1974). Moreover, it is evident to us that within the context of the trial the claimed *10 error was actually "of no moment." State v. Macon, 57 N.J. 325, 337 (1971).
We next consider defendant's contention that the trial court erred in instructing the jury that defendant "under these facts could be found guilty of murder by purposely or knowingly causing the decedent to jump or fall out of the window."
The murder indictment was returned under N.J.S.A. 2C:11-3 which provides that a criminal homicide constitutes murder when the defendant knowingly or purposely causes death or serious bodily injury resulting in death. The terms "purposely" and "knowingly" are defined as follows under N.J.S.A. 2C:2-2b:
(1) Purposely. A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. "With purpose," "designed," "with design" or equivalent terms have the same meaning.
(2) Knowingly. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.
Insofar as applicable N.J.S.A. 2C:2-3 addresses the causal relationship between conduct and result:
a. Conduct is the cause of a result when:
(1) It is an antecedent but for which the result in question would not have occurred; and
(2) The relationship between the conduct and result satisfies any additional causal requirements imposed by the code or by the law defining the offense.
b. When the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation, as the case may be, of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.
The two theories of murder submitted to the jury were that defendant either threw decedent from the window or that *11 decedent, "as a reasonable person in such circumstances, believed that her life was in immediate danger at his hands, and because of such fear jumped from the window to her death." The jury, returned with its verdict a special finding that defendant had not physically thrown Branch from the window. The theory of homicide upon which defendant was convicted, therefore, was that defendant had terrorized and beaten decedent to the point that the course taken appeared to her to be the only rational way out of her desperate situation. Defendant's argument is that a "`reasonable person' would not choose certain death given decedent's circumstances and, even if such act were deemed `reasonable', that act was not foreseeable beyond mere speculation."
In addition to the excerpt from the court's instructions which we quoted at the outset of the preceding paragraph, the jury was also instructed in the following language:
To put it another way, which is what you must find if you are to [find] this way: Would the hitting or beatings, and verbal abuse knowingly or purposely committed by this defendant, cause to compel Rasheeda [Josephine Branch] to jump from the window?
I tell you that, because no one can be said to have acted reasonably if she subjects herself, by jumping out of a window to a certain death, unless she did so to avoid the actions of Lassiter, which she reasonably feared threatened and posed an immediate danger to her life.
Now if you find beyond a reasonable doubt that your answer to those questions is yes, then this defendant must be found guilty of murder.
First, we note our satisfaction that the language of the charge correctly embodied the "but for" test set forth in N.J.S.A. 2C:2-3a(1), supra. It is clear that but for defendant's conduct Branch's death would not have occurred. Furthermore, we find in the trial judge's standard of reasonableness applicable to the decedent's behavior a compliance with N.J.S.A. 2C:2-3b insofar as that enactment requires that the actual result "not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense." Obviously, if Branch acted reasonably in response to the circumstances the result was not "too remote, accidental in its occurrence, or *12 dependent on [decedent's] volitional act...." The jurors were instructed that they were to be governed by what they conceived to be appropriate conduct for "a reasonable person," a formulation traditionally left to the determination of a jury. They were further instructed that such a person is not "the most cautious person in the world; nor one who is usually bold, but rather a person of ordinary reasonable caution and prudence." It was in this context that the further instruction was given that if decedent acted as she did to avoid "the actions of Lassiter, which she reasonably feared threatened and posed an immediate danger to her life," they were to find defendant guilty of murder.
Within the given setting, we find unpersuasive defendant's argument that a reasonable person would not have chosen "certain death given decedent's circumstances." Decedent had just been released from the hospital and was weakened by defendant's brutal behavior to the point where she could not walk unaided to the bathroom. She had been mercilessly beaten with a shovel and with defendant's fists and her pleas and entreaties were repeatedly heard by a number of witnesses during the last fifteen minutes of her life. She was calling for drugs, and it was open to the jury to conclude that in her despair and pain the only visible choices were between being beaten to death and a swifter, more merciful demise at her own hands. If she mis-judged her circumstances it was because defendant had caused her powers of perception to become impaired, an eventuality which was clearly foreseeable to defendant, if not within his actual design.[*]
Defendant also contends that the verdicts were contrary to the weight of the evidence. He concedes that he failed to move for a new trial on this ground as required by R. 2:10-1, but urges that we consider this argument under R. 2:10-2 as *13 plain error. The argument addresses issues having to do with the weight and credibility of the evidence, issues as to which the trial court's findings would be particularly useful. See State v. Kyles, 132 N.J. Super. 397, 401 (App.Div. 1975). Regardless, we have carefully examined the entire record before us for review and are thoroughly satisfied that defendant's convictions are supported by the overwhelming weight of the evidence.
Also raised as plain error by defendant is the trial judge's failure to instruct the jury on the offense of "aiding suicide as a plausible theory of homicide." While it is true that the trial court was obliged to submit to the jury those theories of homicide involving a lesser degree of culpability which find reasonable support in the evidence, State v. Selby, 183 N.J. Super. 273, 280 (App.Div. 1981), such evidence was completely lacking herein. The offense of "aiding suicide," proscribed by N.J.S.A. 2C:11-6, presupposes that the suicidal plan originated with the victim and requires that the act of suicide or the attempt thereat was volitional on her part. As the evidence conclusively demonstrates, Branch's behavior was provoked entirely by abuse and coercion on the part of defendant and was unrelated to any suicidal purpose.
We have also considered defendant's contention, raised in his pro se supplemental brief, that the trial court erred in failing to instruct the jury on the lesser included offense of manslaughter, N.J.S.A. 2C:11-4b. He argues that the evidence would have supported a verdict that the homicide was "committed in the heat of passion resulting from a reasonable provocation." Defendant's theory appears to be that he was so enraged by the sight of his "girlfriend" in bed with another man, that he succumbed to an overpowering urge to violent behavior. The argument is completely without merit. Branch was discovered with the other man at 4:00 on the morning of July 17. The homicide occurred more than twenty-four hours later. The "heat of passion" defense presupposes that the defendant acted *14 upon a great provocation "before a time sufficient to permit reason to resume its sway had passed." State v. King, 37 N.J. 285, 300 (1962). Accord, State v. Bonano, 59 N.J. 515, 523 (1971); State v. McAllister, 41 N.J. 342, 353 (1964).
Finally, we find no merit in defendant's contention that sentencing considerations were "commingled" in sentencing defendant for the aggravated assault. This conviction was based upon the beating administered following the discovery of Branch on the morning of the 17th. It was properly described by the sentencing judge as brutal and for sentencing purposes constituted an offense separate and distinct from the homicide which was committed more than twenty-four hours later. Moreover, we find the sentences imposed on both convictions to be within statutory limits and within the guidelines enunciated in State v. Hodge, 95 N.J. 369 (1984) and State v. Roth, 95 N.J. 334 (1984).
Affirmed.
NOTES
[*] We note again defendant's declaration to Byron Richards of his intention to "kill the bitch."