269 N.J. Super. 344 (1994)
635 A.2d 562
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LEROY BUHL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 29, 1993.
Decided January 3, 1994.
*350 Before Judges PETRELLA, BAIME and CONLEY.
Zulima V. Farber, Public Defender, attorney for appellant (Mark S. Carter, designated attorney, of counsel and on the letter-brief).
Appellant submitted a pro se supplemental letter-brief.
Fred DeVesa, Acting Attorney General, attorney for respondent (Marcy H. Geraci, Deputy Attorney General, of counsel and on the letter-brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a protracted jury trial, defendant was found guilty of first degree kidnapping (N.J.S.A. 2C:13-1b), third degree criminal restraint (N.J.S.A. 2C:13-2a), third degree criminal coercion (N.J.S.A. 2C:13-5a(1)), third degree terroristic threats (N.J.S.A. 2C:12-3a and b), possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4d), four counts of aggravated sexual assault (N.J.S.A. 2C:14-2a(3) and (4)), four counts of sexual assault (N.J.S.A. 2C:14-2c(1)), criminal sexual contact (N.J.S.A. 2C:14-3b), second degree aggravated assault (N.J.S.A. 2C:12-1b(1)), third degree aggravated assault with a deadly weapon (N.J.S.A. 2C:12-1b(2)), and fourth degree possession of a weapon under manifestly inappropriate circumstances (N.J.S.A. 2C:39-5d). Based upon defendant's extensive record of criminality, which included three prior rape convictions, the trial court granted the State's motion for an extended term and imposed a sentence of life imprisonment with a 25 year parole disqualifier on one of the four aggravated sexual assault counts. On the first degree kidnapping *351 count, defendant was sentenced to a consecutive 30 year term, one-half of which to be served without parole eligibility. Concurrent maximum sentences were imposed on the remaining convictions for aggravated sexual assault, second degree aggravated assault and possession of a weapon for an unlawful purpose. One-half of these sentences is to be served without parole eligibility. Applying the doctrine of merger, the judge vacated the jury's verdict of guilty on the remaining counts. Thus, defendant's aggregate sentence is life imprisonment plus 30 years. Defendant is to serve 40 years without parole eligibility.
On appeal, defendant contends that (1) the trial court abused its discretion by finding good cause for continuance of the trial under the Interstate Agreement on Detainers (IAD) (N.J.S.A. 2A:159A-1 to -15), (2) the trial court committed constitutional error by denying his motion to dismiss his attorney and represent himself, (3) evidence pertaining to his attempt to solicit a prison inmate to kill the complaining witness in order to prevent her from testifying was improperly admitted, and (4) the trial court erroneously omitted from its instructions to the jury defendant's claim of intoxication. In his supplemental pro se brief, defendant raises the additional arguments that (1) he was denied the effective assistance of counsel at trial, (2) his present appellate attorney is incompetent and his representation of defendant does not comport with Sixth Amendment standards, (3) he was denied a fair trial by reason of prosecutorial misconduct, (4) his indictment should have been dismissed on the ground of double jeopardy, (5) the trial court improperly permitted the State to amend the indictment, (6) he was denied his right to a speedy trial, (7) he was improperly excluded from the hearing on the prosecutor's motion for a continuance under the IAD, (8) the trial court's preliminary instructions deprived him of a fair trial, (9) the State's proofs were inadequate because the victim failed to identify him at trial, and (10) the trial court abused its discretion by imposing consecutive sentences. We find no error warranting a reversal of defendant's convictions.

*352 I.
At the outset, we note that the State's evidence against defendant was overwhelming. The trial record shrieks of defendant's guilt. According to the victim, N.K., she first met defendant on the evening of August 5, 1988, at the Carousel Lounge in Long Branch, New Jersey. After buying N.K. a drink and engaging in innocuous conversation, defendant requested a ride to his home which he said was located several miles from the bar. N.K. acceded to defendant's request after one of her friends agreed to follow them in his automobile. According to N.K., her friendly gesture ultimately resulted in a terror-filled odyssey through New Jersey and Pennsylvania during which she was brutally beaten and repeatedly raped and sodomized.
N.K. testified that defendant initially appeared friendly and non-threatening. Pursuant to defendant's instructions, N.K. took a meandering course ultimately returning to the Carousel Lounge. N.K.'s friend apparently lost interest and ceased following the victim's automobile. While in the parking lot, defendant briefly exited from N.K.'s car. When N.K. attempted to close the car door, defendant's demeanor suddenly changed. According to N.K., defendant jumped into the automobile, placed a knife to her chest, and threatened "to cut [her] fucking heart out." After a brief struggle, defendant gained control over the automobile. While driving, defendant repeatedly struck N.K.'s face with his fist, telling her that he was "going to kill [her]."
The two ultimately wound up at a gasoline station off the Garden State Parkway. As the attendant approached the automobile, defendant pretended to kiss N.K. while actually biting her lips and cheeks. When N.K. attempted to escape, defendant grabbed her and threw her into the passenger seat. As the automobile pulled out of the station, N.K. managed to "scream." Although initially stunned by these events, the attendant contacted the police. At trial, he testified that he noticed "bruises" and "marks" on N.K.'s face.
*353 Upon departing from the gasoline station, defendant locked his arm around N.K.'s head and threatened to "crush [her] skull," screaming "you're fucking dead." After driving approximately five minutes, defendant forced N.K. to perform oral sex on him, while yelling "suck my dick bitch, act like you like it." Defendant eventually pulled off the road into the back of a factory parking lot. He then raped N.K. vaginally while in the automobile. Defendant then threw the victim out of the car and pushed her onto the front hood, where he again penetrated her vaginally. After completing this act, defendant wrestled N.K. to the side of the automobile where he forced her to commit fellatio. He then dragged her to the back of the automobile where he sodomized the victim, proclaiming "[I] like[] it when [you] cr[y], it turn[s] [me] on." Defendant forced N.K. into the automobile, intermittently choking and threatening the victim.
After leaving the parking lot, the two drove to a desolate dirt road in Pennsylvania, where defendant again forced N.K. to perform oral sex. They then walked to a garbage-strewn house where they met defendant's nephew, David Morgan. When N.K. told Morgan that she had been kidnapped, Morgan responded by laughing. Defendant's other nephew, Bobby (Burl) Morgan, then appeared but he was no more helpful than his brother.
Suffice it to say that N.K.'s nightmare continued at the Morgan residence. Defendant and David Morgan sadistically "played" with various weapons, including "guns and knives[,]" while N.K. watched in horror. Defendant preyed upon N.K.'s fear by taunting her with a firearm. Defendant told the victim he intended to "sell" her to the Morgans so that they could "keep her." When Bobby Morgan left the house, defendant told N.K. it was because he knew she would be killed. Later in the evening, defendant again raped N.K. vaginally.
At approximately 8:00 p.m. that evening, defendant and N.K. left the house. Sensing that her survival depended upon gaining defendant's confidence, N.K. ingested a small amount of "speed" and advised defendant to conceal his portion in his boot. At some *354 point, Officers Daniel Cloutier and Robert Phillips of the Schuylkill Haven Police Department stopped N.K.'s automobile for a traffic infraction. Upon approaching the passenger side of the vehicle, Officer Phillips noticed that "[t]he right side of [N.K.'s] face from her temple down to her chin area ... was all black and blue." He also noticed that she was "fidgeting in her seat, looking back and forth to the driver" and silently mouthing the words "help me." Officer Phillips opened the passenger side door allowing N.K. to escape from the automobile and enter the police vehicle where she immediately locked the doors. When defendant attempted to exit from the driver's side, Officer Phillips ordered him to remain in the car. The officer then approached the police vehicle and noticed N.K. curled in the "fetal position." The officer asked N.K. what was wrong. She responded that defendant had kidnapped and raped her. As Phillips instructed Cloutier to restrain defendant, the latter sped away, ultimately eluding the police after a high speed chase. N.K. was later hospitalized in a state of shock. The victim's injuries comported with her description of defendant's violent attacks.
Defendant was apprehended by FBI agents when he returned to the Morgan residence more than one month after the incident. He was taken into federal custody on September 28, 1988. While awaiting trial, defendant wrote a series of letters to a fellow inmate who was soon to be released, asking him to kill N.K. so that she could not testify against him. In these letters, defendant noted that, without N.K., the prosecution had no evidence, and therefore "the dame got to go ... [and] never be found." After apprising the inmate of N.K.'s general schedule, defendant instructed him to "sit," "wait" and "snatch" her. For murdering N.K., defendant promised the inmate that he would kill someone for him, noting that he would "off anybody" and "return [the favor] a thousand times if necessary."
Prior to the prosecution in New Jersey, defendant was tried and convicted of kidnapping by transporting the victim across state lines under the Federal Kidnapping Act (18 U.S.C.A. § 1201(a)(1)). *355 He was then tried and convicted of the crimes committed in Pennsylvania by that state's authorities. It is against this factual backdrop that we consider defendant's arguments.

II.
Defendant first contends that the trial court erred when it granted the State's motion for a continuance of the trial pursuant to the IAD. The salient facts underlying this claim can be briefly summarized.
On May 7, 1990, defendant, while in federal custody at the United States Penitentiary in Marion, Illinois, requested disposition of the New Jersey detainer. This request was received by the Monmouth County Prosecutor's Office on May 18, 1990. On August 21, 1990, the prosecutor requested temporary custody of defendant for the week of September 10, with the trial to begin on September 24, 1990. Apparently, defendant was on trial in Pennsylvania during the summer months of 1990. In any event, after completion of the Pennsylvania proceedings, defendant was returned to the Federal Penitentiary in Illinois. Federal prison officials initially refused to release defendant to the transport service the prosecutor's office had retained. The record does not disclose the reason for this refusal. We note parenthetically that defendant had a lengthy history of incarceration and had attempted to escape on several occasions. It is possible that the federal authorities' refusal to release defendant to the transport service provided by the prosecutor was somehow related to these incidents. In any event, the record is largely uninformative on this point and we find it irrelevant to our disposition of the issues raised.
Defendant was transported to New Jersey on October 5, 1990. Although less than 180 days had elapsed from the date of defendant's request for disposition of the charges, the prosecutor was granted a continuance on November 2, 1990. The trial was scheduled to commence in January 1991. However, defendant *356 was granted a one month adjournment to enable him to prepare for trial.
Under the IAD, a defendant must be brought to trial within 180 days after he has "caused to be delivered" to the prosecutor and the court a request for final disposition of charges pending against him. N.J.S.A. 2A:159A-3(a). For "good cause shown[,]" the court "may grant any necessary or reasonable continuance." Ibid. The IAD does not define the term "good cause." We have held that "whether good cause exists ... must be resolved from a consideration of the totality of circumstances in [a] particular case." State v. Lippolis, 107 N.J. Super. 137, 148-49, 257 A.2d 705 (App.Div. 1969) (dissenting opinion), rev'd on dissent, 55 N.J. 354, 262 A.2d 203 (1970); see also State v. Johnson, 188 N.J. Super. 416, 421, 457 A.2d 1175 (App.Div. 1982), certif. denied, 93 N.J. 282, 460 A.2d 681 (1983).
Here, we are entirely satisfied that the trial court did not abuse its discretion in finding the presence of good cause and granting a continuance. In reaching this conclusion, we recognize that the prosecutor made no attempt to gain custody of the defendant until August 21, 1990, approximately three months after receiving the demand for final disposition of the New Jersey charges. However, this delay must be considered in the context of the normally reduced trial calendar generally attendant to the summer months. In all probability, defendant would have languished in the county jail had he been transported to New Jersey at an earlier date.
Other circumstances militated in favor of granting a continuance. As we noted previously, criminal proceedings in other jurisdictions were pending against defendant when he sent his request for disposition of the New Jersey indictment. A defendant should not be able to evade or delay pending prosecution or proceedings in one state by seeking disposition of charges in another jurisdiction under the IAD. State v. Binn, 208 N.J. Super. 443, 449, 506 A.2d 67 (App.Div.), certif. denied, 104 N.J. 471, 517 A.2d 452 (1986). The IAD was designed to help persons incarcerated in other jurisdictions to secure a speedy trial in the *357 forum state. Carchman v. Nash, 473 U.S. 716, 719-20, 105 S.Ct. 3401, 3403-04, 87 L.Ed.2d 516, 520-21 (1985); see also United States v. Mauro, 436 U.S. 340, 351, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329, 341 (1978). However, a defendant cannot reasonably expect contemporaneous disposition of charges pending in several jurisdictions. Pending proceedings in the "sending state" can be the basis for a continuance or a tolling of the 180 day requirement. State v. Binn, 208 N.J. Super. at 449, 506 A.2d 67.
Beyond this, the record plainly indicates that defendant was not prepared to proceed to trial within the statutory time period. Indeed, defendant later requested an adjournment of the trial. Thus, defendant "affirmative[ly] request[ed] to be treated in a manner contrary to [the IAD]" and waived his right to have the trial commence within 180 days of his request for final disposition of the pending charges. United States v. Eaddy, 595 F.2d 341, 344 (6th Cir.1979); see also Yellen v. Cooper, 828 F.2d 1471, 1474 (10th Cir.1987); Gray v. Benson, 608 F.2d 825, 827 (10th Cir.1979).

III.
We next turn to defendant's claim that he was denied the constitutional right to represent himself. Defendant contends that the trial court's inquiry into whether his waiver of the right to counsel was "knowing and intelligent" was wholly inadequate. He asserts that he should have been permitted to proceed pro se.
We commence our analysis by reviewing the applicable constitutional principles. Although the right of self-representation has deep roots in the common law, see 3 Halsbury's Laws of England § 1141 at 624-25 (4th ed. 1973), it was first held to be of federal constitutional dimension in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). While recognizing that "in most criminal prosecutions defendants [can] better defend with [an attorney's] guidance than by their own unskilled efforts," Faretta v. California, 422 U.S. at 834, 95 S.Ct. at 2540, 45 L.Ed.2d at 581, the Court stressed that the notion of compulsory counsel was foreign to the founders of the Constitution and that "those who *358 wrote the Bill of Rights[] surely ... understood the inestimable worth of free choice." Id. at 833-34, 95 S.Ct. at 2540, 45 L.Ed.2d at 581. The Court added that "[t]o force a lawyer on a defendant can only lead him to believe that the law contrives against him." Id. at 834, 95 S.Ct. at 2540, 45 L.Ed.2d at 581. Although acknowledging the probability that a defendant "may conduct his own defense ultimately to his own detriment," the Court stressed that "his choice must be honored out of `that respect for the individual which is the life-blood of the law.'" Id. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d at 581 (quoting Illinois v. Allen, 397 U.S. 337, 350-51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353, 363 (1970) (Brennan, J., concurring)).
A defendant can exercise the right to self-representation only by first knowingly and intelligently waiving his right to counsel. McKaskle v. Wiggins, 465 U.S. 168, 173, 104 S.Ct. 944, 948, 79 L.Ed.2d 122, 130 (1984); Faretta v. California, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581. We have consistently required trial judges to engage in a searching inquiry with defendants seeking to proceed pro se. See, e.g., State v. Slattery, 239 N.J. Super. 534, 547, 571 A.2d 1314 (App.Div. 1990) (requiring searching and painstaking inquiry, including legal elements of crimes and possible lesser-included offenses); State v. Kordower, 229 N.J. Super. 566, 577-79, 552 A.2d 218 (App.Div. 1989) (requiring penetrating and comprehensive inquiry when informing defendant of incarceration exposure and technical difficulties he or she might encounter in acting as his or her own attorney); State v. Lach, 213 N.J. Super. 466, 470-71, 517 A.2d 882 (App.Div. 1986) (court must explain range of allowable punishments, possible defenses and circumstances in mitigation, and dangers and disadvantages inherent in defending oneself); State v. Guerin, 208 N.J. Super. 527, 535, 506 A.2d 743 (App.Div. 1986) (court must advise defendant of advantages and disadvantages of self-representation); State v. Cole, 204 N.J. Super. 618, 624-25, 499 A.2d 1030 (App.Div. 1985) (searching inquiry should include statutory offenses included within charges, the range of allowable punishments *359 thereunder and possible defenses and circumstances in mitigation); State v. Abbondanzo, 201 N.J. Super. 181, 185, 492 A.2d 1077 (App.Div. 1985) (court must advise pro se defendant of incarceration exposure before determining there has been an effective waiver of counsel).
Because of the importance of trial counsel, our Supreme Court has "imposed the most rigorous [requirements] on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to [an attorney]." State v. Crisafi, 128 N.J. 499, 510, 608 A.2d 317 (1992) (quoting Patterson v. Illinois, 487 U.S. 285, 298, 108 S.Ct. 2389, 2398, 101 L.Ed.2d 261, 276 (1988)). "To ensure that a waiver of counsel is knowing and intelligent, the trial court should inform pro se defendants of the nature of the charges against them, the statutory defenses to those charges, and the possible range of punishment." Id. 128 N.J. at 511, 608 A.2d 317 (citing United States v. Padilla, 819 F.2d 952, 957 (10th Cir.1987); United States v. McDowell, 814 F.2d 245, 251 (6th Cir.), cert. denied, 484 U.S. 980, 108 S.Ct. 478, 98 L.Ed.2d 492 (1987)). The defendant should be informed of the technical problems he may encounter and of the risks he takes if his defense is unsuccessful. Id. 128 N.J. at 511-12, 608 A.2d 317 (citing United States v. Welty, 674 F.2d 185, 188 (3d Cir.1982)). The court should apprise the defendant that he will be bound by procedural and evidentiary rules, and that his lack of knowledge of the law may impair his ability to defend himself. Id. 128 N.J. at 512, 608 A.2d 317 (citing McMahon v. Fulcomer, 821 F.2d 934, 945 (3d Cir.1987)). The colloquy envisioned by the Court "will test the defendant's understanding of the implications of the waiver, and will provide [the] appellate [tribunal] with an objective basis for review." Id. at 511, 608 A.2d 317 (citing Strozier v. Newsome, 926 F.2d 1100, 1104 (11th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 350, 116 L.Ed.2d 289 (1991); People v. Sawyer, 57 N.Y.2d 12, 21, 453 N.Y.S.2d 418, 423, 438 N.E.2d 1133, 1138 (1982), cert. denied, 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1024 (1983)).
*360 These protections recognize the "obvious but important truth that `the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty.'" State v. Slattery, 239 N.J. Super. at 545, 571 A.2d 1314 (quoting Johnson v. Zerbst, 304 U.S. 458, 462-63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461, 1465-66 (1938)). Without the guiding hand of counsel, a defendant may lose his freedom because he does not know how to establish his innocence. Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158, 170 (1932). Trained counsel is also necessary to vindicate fundamental rights that receive protection from rules of procedure and exclusionary principles. State v. Sugar, 84 N.J. 1, 15-16, 417 A.2d 474 (1980). The point to be stressed is that, while a defendant has the constitutional right to dispense with counsel, there is a strong presumption against waiver.
It is against this constitutional background that we examine defendant's claimed violation of Sixth Amendment rights. Defendant's argument must be considered within the procedural context in which it was raised in the Law Division. Because of the serious nature of the crimes charged in the indictment, defendant's case was assigned to a highly experienced Public Defender attorney. However, defendant was incarcerated in Trenton State Prison and it is apparent that he experienced difficulty in communicating with his lawyer. On December 14, 1990, defendant moved to dismiss his attorney and represent himself. In his accompanying affidavit, defendant expressed dissatisfaction with his lawyer's investigation and claimed that the attorney was "incompetent."
A hearing on defendant's motion was conducted on January 22, 1991. We glean from the record that the purpose of the hearing was to determine whether defendant's purported waiver of his right to counsel was "knowing" and "intelligent." Through specific inquiry with the defendant, it became apparent almost at the outset that his principal complaint pertained to his attorney's alleged incompetence. Defendant repeatedly expressed his mounting frustration that his case was not being given the attention *361 it required. After apprising the defendant of the dangers of proceeding pro se, the trial court suggested that a hybrid form of representation would best serve the interests of justice. Specifically, defendant was permitted to file pro se motions directly with the court. Further, he was allowed to place any argument he wished to advance on the record with or without his attorney's concurrence. The trial court also granted a brief continuance of the trial to enable the defendant to prepare and file motions and to communicate whatever concerns he harbored to his attorney. Defendant expressed his satisfaction with this arrangement, noting that he had "no personal qualms against [his lawyer]" but that they "ha[d] not had [sufficient] time to get together on this case." Defendant added that "[a]mple opportunity should be given for counsel and myself to get together." The trial court agreed and continued the trial.
In accordance with this arrangement, defendant filed a plethora of pro se motions in addition to those submitted by his attorney. Ultimately, most of these motions were denied and the trial was scheduled to begin on February 25, 1991. On that date, defendant's attorney recounted his largely unsuccessful efforts to secure the attendance of various individuals who defendant suggested had relevant information. We need not describe the steps the attorney had taken. Suffice it to say that these efforts were substantial. Dissatisfied with his attorney and frustrated by the trial court's denial of his motions, defendant requested to dismiss his lawyer and proceed pro se. This motion was denied. A jury was then selected and the trial commenced. After demanding that the trial judge recuse himself, defendant voluntarily absented himself. The trial proceeded with the defendant being represented by his assigned attorney.
We are convinced that the trial court properly denied defendant's requests to represent himself. In reaching this conclusion, we recognize that the choice between proceeding with an attorney with whom the defendant disagrees or proceeding pro se may produce a valid waiver of counsel. See United States v. *362 Grosshans, 821 F.2d 1247, 1251 (6th Cir.) (defendant who disagreed with appointed counsel's beliefs regarding legality of tax system not forced to proceed pro se), cert. denied, 484 U.S. 987, 108 S.Ct. 506, 98 L.Ed.2d 505 (1987); United States v. Weninger, 624 F.2d 163, 166-67 (10th Cir.) (refusal of defendant to hire counsel unless lawyer agreed with his views on invalidity of tax laws deemed knowing and intelligent waiver), cert. denied, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); State v. DeWeese, 816 P.2d 1, 4 (1991) ("[w]hen an indigent defendant fails to provide the court with legitimate reasons for the assignment of substitute counsel, the court may require the defendant to either continue with current appointed counsel or to represent himself."). So too, "[w]hen the alternative is representation by the Public Defender, choosing to proceed pro se constitutes a voluntary waiver of counsel." State v. Crisafi, 128 N.J. at 517, 608 A.2d 317 (citing United States v. Robinson, 913 F.2d 712, 715-17 (9th Cir.1990), cert. denied, 498 U.S. 1104, 111 S.Ct. 1006, 112 L.Ed.2d 1089 (1991); United States v. Moya-Gomez, 860 F.2d 706, 739 (7th Cir.1988), cert. denied sub nom. Estevez v. United States, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989)).
This much conceded, a defendant cannot "manipulate the system by wavering between assigned counsel and self-representation." Ibid. "If a defendant has good cause for substituting counsel, the trial court should entertain a request." Id. 128 N.J. at 518, 608 A.2d 317. However, our Supreme Court has said that "[d]isagreement over defense strategy ... does not rise to the level of good cause." Ibid. (citing United States v. Padilla, 819 F.2d at 956 (10th Cir.1987)). Moreover, like any other request for substitution of an attorney, a defendant's decision to dismiss his lawyer and represent himself must be exercised in a timely fashion. The right of self-representation is not a license to disrupt the criminal calendar, or a trial in progress. Cf. Mayberry v. Pennsylvania, 400 U.S. 455, 468, 91 S.Ct. 499, 506, 27 L.Ed.2d 532, 541-42 (1971) (Burger, J., concurring); State v. Slattery, 239 N.J. Super. at 542, 571 A.2d 1314; State v. Ferguson, 198 N.J. Super. *363 395, 401, 487 A.2d 730 (App.Div.), certif. denied, 101 N.J. 266, 501 A.2d 933 (1985); State v. Wiggins, 158 N.J. Super. 27, 33, 385 A.2d 318 (App.Div. 1978); State v. White, 86 N.J. Super. 410, 418-19, 207 A.2d 178 (App.Div. 1965). A criminal trial is not a "private matter." Mayberry v. Pennsylvania, 400 U.S. at 468, 91 S.Ct. at 506, 27 L.Ed.2d at 542. In every trial there is more at stake than just the interests of the accused. Id. at 468, 91 S.Ct. at 506, 27 L.Ed.2d at 541. A defendant cannot be permitted to place the trial judge in the unenviable dilemma where, in managing the business of the court, he appears to be depriving the accused of his right to self-representation.
In an unbroken line of decisions, the federal courts have held that a request for self-representation must be made before meaningful trial proceedings have begun. See, e.g., Savage v. Estelle, 924 F.2d 1459, 1463 n. 7 (9th Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2900, 115 L.Ed.2d 1064 (1991); United States v. Wesley, 798 F.2d 1155, 1155-56 (8th Cir.1986); United States v. Gillis, 773 F.2d 549, 559 n. 14 (4th Cir.1985); United States v. Lorick, 753 F.2d 1295, 1298 (4th Cir.), cert. denied, 471 U.S. 1107, 105 S.Ct. 2342, 85 L.Ed.2d 857 (1985); United States v. Brown, 744 F.2d 905, 908 n. 2 (2d Cir.), cert. denied, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984); United States v. Denno, 348 F.2d 12, 15 (2d Cir.1965), cert. denied sub nom. Diblasi v. McMann, 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966). While it has been said generally that a request to proceed pro se made before a jury is sworn should ordinarily be honored, see, e.g., United States v. Smith, 780 F.2d 810, 811 (9th Cir.1986); Pitts v. Redman, 776 F. Supp. 907, 915 (D.Del. 1991), aff'd, 970 F.2d 899 (3d Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 611, 121 L.Ed.2d 545 (1992), we believe that this proposition has been stated too broadly. The right of self-representation cannot be insisted upon in a manner that will obstruct the orderly disposition of criminal cases. A defendant desiring to exercise the right must do so with reasonable diligence.
*364 Applying these principles, we find no abuse of discretion in the trial court's denial of defendant's requests to proceed pro se. As to defendant's initial motion, we hold that his request was undermined by his own frequent changes of mind regarding whether he wished to be represented by a lawyer and, if so, what his role was to be. Although defendant originally insisted he wished to proceed entirely without assistance, he then expressly agreed to continue with the aid of his assigned attorney on the condition that he be permitted to file pro se motions and advance supplemental arguments. Faretta does not require a trial judge to permit a "hybrid" representation of the type defendant was actually allowed. See McKaskle v. Wiggins, 465 U.S. at 183, 104 S.Ct. at 953, 79 L.Ed.2d at 136. But if a defendant is given that opportunity and elects to proceed on that basis, his subsequent complaints lose much of their force. A defendant does not have a constitutional right to choreograph counsel's role.
Defendant's second request was made immediately before the jury was impaneled and was untimely. It is abundantly plain that the trial judge would have been required to continue the trial for a substantial period had he acceded to defendant's demand. The prosecutor's legitimate demand for stability in the scheduling of cases was properly accorded priority. We thus find no basis to disturb the trial court's discretionary determination.

IV.
The remaining arguments advanced by defendant's appellate attorney do not require extended discussion.
Defendant's letters to a fellow inmate requesting him to kill the victim in order to prevent her from testifying were properly admitted under Evid.R. 55 (now N.J.R.E. 404(b)). Our courts have long held that evidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt. See, e.g., State v. Johnson, 216 N.J. Super. 588, 611, 524 A.2d 826 (App.Div. 1987) *365 (no error by the prosecutor in attempting to establish that the witness was intimidated by defendant while both were incarcerated); State v. Hill, 47 N.J. 490, 500, 221 A.2d 725 (1966) (testimony that after trial began defendant accosted witness and threatened to kill him if witness took stand was admissible); State v. Lassiter, 197 N.J. Super. 2, 8, 484 A.2d 13 (App.Div. 1984) (witness allowed to testify that he had been shot three days before defendant's case was scheduled for trial); State v. Plowden, 126 N.J. Super. 228, 231, 313 A.2d 802 (App.Div.) (testimony that after shooting, defendant said he would kill anyone who identified him), certif. denied, 64 N.J. 504, 317 A.2d 717 (1974). See also State v. Rivera, 232 N.J. Super. 165, 174, 556 A.2d 1227 (App.Div.) (defendant's attempt to marry girlfriend admissible as evidence of consciousness of guilt), certif. denied, 117 N.J. 169, 564 A.2d 885 (1989).
Equally without merit is defendant's argument that the trial court erred by refusing to instruct the jury on the defense of intoxication. Where purposeful or knowing conduct is an element of a crime, evidence of voluntary intoxication is admissible to disprove the requisite mental state. State v. Cameron, 104 N.J. 42, 53, 514 A.2d 1302 (1986); N.J.S.A. 2C:2-8. There must exist a "prostration of faculties such that defendant was rendered incapable of forming an intent" before a trial court is required to submit the issue to a jury. State v. Cameron, 104 N.J. at 54, 514 A.2d 1302. Specifically, the intoxication must render the defendant incapable of purposeful or knowing conduct. Id. at 56, 514 A.2d 1302. Guiding factors include "the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others ..., any odor of alcohol or other intoxicating substance, the results of any tests to determine blood-alcohol content, and the actor's ability to recall specific events." Ibid. Testimony by the victim or defendant that the defendant was "drunk" is no more than a conclusory label, of little assistance in determining whether any drinking produced a prostration of faculties. Ibid.
*366 Measured against these standards, the evidence was not sufficient to establish a level of intoxication requiring submission of the question to the jury. There is absolutely no indication that defendant was rendered incapable of purposeful or knowing conduct. The trial court correctly denied defendant's request to charge intoxication as a defense.

V.
We next consider the contentions advanced in defendant's pro se supplemental brief. We treat separately defendant's claim that the New Jersey prosecution was barred by double jeopardy. Defendant's other arguments clearly lack merit and do not require comment. R. 2:11-3(e)(2).
In January of 1989, a federal jury found defendant guilty of kidnapping by transporting the victim across state lines. Defendant was sentenced to life imprisonment. In September of 1989, a Pennsylvania jury found defendant guilty of rape, involuntary deviate sexual intercourse, and unlawful restraint. We have not been apprised of the sentences imposed on the Pennsylvania convictions.
Defendant contends that the federal conviction for kidnapping involved the same conduct as that for which he was found guilty in New Jersey. He claims that the New Jersey prosecution for kidnapping was barred by the federal and state prohibitions against double jeopardy and by the restrictions contained in N.J.S.A. 2C:1-11a. We disagree with both contentions.
Initially, we reject defendant's claim that the New Jersey prosecution for kidnapping was constitutionally proscribed. The doctrine of dual sovereignty has long been accepted by the United States Supreme Court. See Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922). This doctrine "recognizes that separate governmental jurisdictions have concurrent *367 power to proscribe criminal conduct and to prosecute crime; and, further, each sovereign may exercise this power without regard to whether particular conduct is or was the subject of separate criminal proceedings undertaken by another jurisdiction." State v. Goodman, 92 N.J. 43, 51, 455 A.2d 475 (1983). Although the dual sovereignty doctrine has engendered "virile and abundant criticism," ibid., it has its defenders as well. It has been said, for example, that "[a] contrary rule could result in an unseemly race between the federal and state authorities to obtain early jurisdiction." State v. Cooper, 54 N.J. 330, 337, 255 A.2d 232 (1969), cert. denied, 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514 (1970). Moreover, in light of "ideological differences between the federal government and some of the states in determining the gravity of various criminal offenses[,] [a] prohibition against a second trial ... could well eventuate in a frustration of either the national or state policy and law enforcement." Id. at 337-38, 255 A.2d 232. In any event, our Supreme Court has acknowledged that the principle of dual sovereignty is firmly established in this jurisdiction. State v. Goodman, 92 N.J. at 51, 455 A.2d 475; see also State v. Cooper, 54 N.J. at 338, 255 A.2d 232; State v. King, 215 N.J. Super. 504, 512, 522 A.2d 455 (App.Div. 1987); State v. Cioffe, 128 N.J.L. 342, 347-48, 26 A.2d 57 (Sup.Ct. 1942), aff'd, 130 N.J.L. 160, 32 A.2d 79 (E. & A. 1943). Neither the Fifth Amendment prohibition against double jeopardy nor our State constitutional counterpart (N.J. Const. art. I, ¶ 11) barred defendant's prosecution in New Jersey for kidnapping.
More troublesome is defendant's contention that the New Jersey prosecution for kidnapping was barred by N.J.S.A. 2C:1-11a. Under that section, a prosecution in the United States District Court constitutes a bar to a subsequent prosecution in this State if:
The first prosecution resulted in an acquittal or in a conviction, ... and the subsequent prosecution is based on the same conduct, unless (1) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a *368 substantially different harm or evil or (2) the offense for which the defendant is subsequently prosecuted is intended to prevent a substantially more serious harm or evil than the offense of which he was formerly convicted or acquitted or (3) the second offense was not consummated when the former trial began....
It has been said that N.J.S.A. 2C:1-11a represents a "drastic curtailment" of the dual sovereignty doctrine. State v. Goodman, 92 N.J. at 51, 455 A.2d 475.
Application of the statutory prohibition depends initially upon whether the federal and New Jersey prosecutions are "based on the same conduct." N.J.S.A. 2C:1-11a. The Code defines "conduct" as "an action or omission and its accompanying state of mind, or, where relevant, a series of acts and omission." N.J.S.A. 2C:1-14d. The phrase "same conduct" also appears in N.J.S.A. 2C:1-8, which concerns the method of prosecution when conduct constitutes more than one offense. The latter section deals with questions of merger. The term "same conduct" as used in N.J.S.A. 2C:1-11a has been interpreted to mean "identical conduct[,]" that is conduct referring to one particular set of actions occurring on only one occasion. State v. DiVentura, 187 N.J. Super. 165, 172, 453 A.2d 1354 (App.Div. 1982), certif. denied, 93 N.J. 261, 460 A.2d 666 (1983). "Overlapping conduct is not identical." State v. Ashrue, 253 N.J. Super. 181, 184, 601 A.2d 265 (Law Div. 1991). This construction of the statutory bar is consistent with that given by the courts of other jurisdictions. See State v. Esham, 321 A.2d 512, 514 (Del. Super. Ct. 1974); cf. State v. Bellamy, 8 Ill. App.3d 606, 290 N.E.2d 645 (1972).
Applying that definition here, it is apparent that the federal prosecution involved different conduct than that embraced in the New Jersey indictment. Under N.J.S.A. 2C:13-1b, a "non-ransom kidnapping ... requires proof that the victim [was] unlawfully removed either from a place of residence or business or a substantial distance, or was unlawfully confined for a substantial period of time, and that the removal was done for an enumerated unlawful purpose." State v. Marchand, 227 N.J. Super. 92, 95, 545 A.2d 819 (App.Div. 1988), aff'd, 114 N.J. 569, 555 A.2d 1122 (1989); see also State v. LaFrance, 117 N.J. 583, 569 A.2d 1308 (1990); *369 State v. Masino, 94 N.J. 436, 466 A.2d 955 (1983). "[O]ne is transported a `substantial distance' if that asportation is criminally significant in the sense of being more than merely incidental to the underlying crime." State v. Masino, 94 N.J. at 447, 466 A.2d 955. "That determination is made with reference not only to the distance travelled but also to the enhanced risk of harm resulting from the asportation and isolation of the victim." Ibid. The same principle applies in determining whether the restraint of the victim was for a "substantial period." N.J.S.A. 2C:13-1b. In either case, the asportation or the restraint must be significant in presenting an enhanced risk of harm to the victim. State v. LaFrance, 117 N.J. at 585, 569 A.2d 1308. In contrast, the conduct prohibited by the federal kidnapping statute, 18 U.S.C.A. § 1201(a)(1), pertains to the "willful[] transport[] [of the victim] in interstate ... commerce." "[I]nterstate commerce" means crossing state lines. See United States v. Broadwell, 870 F.2d 594, 601 n. 16 (11th Cir.), cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989); United States v. Hall, 587 F.2d 177, 181 (5th Cir.), cert. denied sub nom. Dyar v. United States, 441 U.S. 961, 99 S.Ct. 2405, 60 L.Ed.2d 1065 (1979). Clearly, the conduct proscribed by the federal and New Jersey statutes is different. Consistent with the statutory language, the federal prosecution related to defendant's asportation of N.K. across state lines, while the State prosecution pertained to the asportation or restraint of the victim which presented an enhanced risk of harm. The conduct which was the subject of the separate prosecutions was not the "same" or "identical." State v. DiVentura, 187 N.J. Super. at 172, 453 A.2d 1354.
In any event, the result would be no different even if we were to consider the prosecutions as based on the same conduct. That is true because the State and federal kidnapping statutes each "requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil." N.J.S.A. 2C:1-11a(1). As we pointed out, the State statute is designed to proscribe an asportation or restraint that is significant in posing an enhanced risk of harm to *370 the victim. The federal statute is aimed at barring asportation of the victim across state lines. Each statute requires proof of an element not required by the other and each is designed to prevent a substantially different harm or evil. In a similar vein, it is at least arguable that the New Jersey prosecution and its application of its kidnapping statute were "intended to prevent a substantially more serious harm or evil than the [federal] offense of which [the defendant] was formerly convicted." N.J.S.A. 2C:1-11a(2). We thus conclude that the statutory bar was inapplicable.
Affirmed.