1 A.3d 767 (2010)
415 N.J. Super. 210
STATE of New Jersey, Plaintiff-Respondent,
v.
Quran GOODMAN, a/k/a Quan Goodman, Quan M. Goodman, Defendant-Appellant.
Docket No. A-1329-07T4
Superior Court of New Jersey, Appellate Division.
Submitted March 17, 2010.
Decided August 9, 2010.
*769 Yvonne Smith Segars, Public Defender, attorney for appellant (Susan Brody, Assistant Deputy Public Defender, of counsel and on the brief).
Paula T. Dow, Attorney General, attorney for respondent (Johanna Barba Jones, Deputy Attorney General, of counsel and on the brief).
Before Judges CUFF, PAYNE and WAUGH.
The opinion of the court was delivered by
WAUGH, J.A.D.
Defendant Quran Goodman appeals his conviction for the murder of Rashon Bryant, contrary to N.J.S.A. 2C:11-3(a) (count one); third-degree unlawful possession of a handgun, contrary to N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a) (count three). We affirm.

I.
We discern the following facts from the record, including the testimony given at Goodman's trial.

A.
Goodman, whose street name was "Blak," was a member of the "Crips" gang. Prior to the events that gave rise to this case, he and Bryant had a longstanding friendship. Goodman regularly spent time at the corner located at the intersection of Ellis Avenue and Hopkins Place in Irvington. And, at various times, Bryant sold drugs at the same corner.
Goodman and other Crips members attempted without success to convince Bryant to become a Crip. In 2000, when Bryant was sentenced to state prison, he was not a member of any gang. However, according to Tauheedah Carney,[1] his girlfriend from 1999 until his death in 2004, Bryant became a member of the "Bloods" gang while incarcerated. Carney described the Crips and Bloods as rival gangs, each of which used certain colors and language as gang symbols.
*770 Carney described the corner frequented by Goodman and Bryant as Crips territory. She related that, in 1999, when she was occasionally dropped off at the corner by Bloods members, Goodman would ask "[w]hy [she] was letting them slob n* *gers drop [her] off [t]here."[2] Goodman even objected to her wearing brown scarves because brown was a Bloods color.
According to Carney, she remained Bryant's girlfriend during his incarceration, writing to him while he was in prison. After almost four and a half years of incarceration, Bryant was transferred to a halfway house in March 2004. Carney visited Bryant every week while he was at the halfway house.
On one occasion in 2004, Carney told Goodman that Bryant had asked about him. According to Carney, Goodman seemed angry and responded "that he don't want to talk to [Bryant] because [Bryant] turned to the other side on him."
Bryant was released from the halfway house on June 28, 2004. On the night of July 4, 2004, Carney agreed to go with Bryant to the corner of Ellis Avenue and Hopkins Place at 11:00 p.m., where Bryant intended to see Goodman. Bryant asked her to bring a gun to him at the corner, but did not explain why. Bryant left for the corner early and did not pick Carney up, so Carney had a friend drop her off.
When Carney arrived at the corner, she observed that an argument was taking place nearby, but she could not discern the participants. She called out to Bryant, who walked over to her with a man she had seen once before but did not know by name. Goodman approached them from another direction and gave Carney a hug. According to Carney, she witnessed no argument between Goodman and Bryant and there was no sign that Goodman possessed a weapon at that time. After hugging Carney, Goodman
walked up to ... the porch [of a nearby house], talked to some girl for a minute. Then he left the porch, went around the house, came back around the house. He stood in front of us. He asked the guy that was with [Bryant] for some cigarettes. The boy say he was gonna save him something, that's when he shot [Bryant].
Carney related that she was standing not more than two feet away from Bryant when he was shot.
Carney heard three shots, began to run away, and then heard more shots. When she turned around, she saw Goodman running from the corner towards Springfield Avenue. The unidentified man was sitting on a nearby curb crying, but was gone by the time the police arrived. Carney returned to Bryant, but he appeared to be dead. He was subsequently pronounced dead at the scene.
Angela Smith and a friend were also at the corner of Ellis Avenue and Hopkins Place on the evening of the shooting, having purchased cocaine from Bryant. Smith observed that a crowd was gathered at the corner, and she saw Bryant and Goodman at the corner with a woman she did not know. Bryant and Goodman were having an argument. She heard someone say: "Go ahead, do what you gotta do," and saw Goodman walk out of sight. Smith then observed Goodman return, walk up to Bryant, and shoot him four or five times.
When the police and an ambulance arrived, Carney told the police officers that she was Bryant's girlfriend, but gave them a false name and told them that she did not see who had shot Bryant. She testified that she did so because she did *771 not want people in the crowd to know her name or that she was supplying information to the police. Later, at the Irvington police station, Carney told Detective Harold Wallace what she had seen and identified Goodman as the person who shot Bryant. She eventually gave the police a complete statement.

B.
Goodman was indicted in November 2004. In May 2005, Goodman and his cousin, Naim Jones, were both incarcerated at the Essex County Jail. Jones, who was known as "Murda," was a Bloods member, and had fathered a daughter with Carney's best friend. On May 11, 2005, during a search following a disturbance at the jail, Sergeant John Ferrante of the Essex County Department of Corrections found a letter written by Goodman in Jones's cell. The letter, as subsequently redacted for the jury, stated:
4/18/05, Murda, what's hood?, Yeah, this is ya lil cousin. Yo, I'm writing you because I just got indicted today in court and I truly need you to reach out to those mean streets and do your numbers. I'm sending you one page of my paperwork. I hope this is enough. If not, let me know. I was just in court with your dude Uzikas and he knew a lot about me and we was talkin on some real street shit about ol' girl, and he told me that y'all can't move off of word of mouth and that y'all needed some paperwork. So, here's the paperwork. Murda, I really need you. You are my only hope, so get back to me and let me know something, a'ight? Your lil cousin forever, Blak. P.S., let me know if you got the paperwork. I sent it with the letter. Okay.
A copy of the first page of Carney's statement, with her identifying information and address, was attached to the letter. Jones's girlfriend told Carney about the letter at some point thereafter.
Carney was incarcerated in the Essex County Jail at the time of Goodman's trial. On August 22, 2006, while she was in a holding cell in anticipation of testifying at the trial, she saw Goodman being transferred within the jail. According to Carney, Goodman "walked up to the [holding cell] and said is I'm gonna testify against him and I asked him why he do that? He say, he could had done something to me, and I ain't never say nothing back to him. I just looked at him." She believed Goodman meant that he would have had "somebody do something" to her if he had known she was going to testify against him.
Goodman's jury trial started on August 29, 2006. Goodman sought to bar the introduction of any evidence related to gang membership, including expert testimony, arguing that it was irrelevant and unduly prejudicial. Judge John C. Kennedy held a Rule 104 hearing. After noting that there were no New Jersey cases specifically allowing the utilization of such evidence to demonstrate motive, the judge concluded that the proposed evidence satisfied the requirements of N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328, 605 A.2d 230 (1992) ("[E]ven if the other-crime evidence is relevant to prove some legitimate trial issue, the trial court must exclude it unless... its probative value outweighs its prejudicial impact."). He also cited case law from other jurisdictions that "generally agreed" that evidence showing that a defendant and victim were members of different gangs would be admissible for the purpose of showing motive.
The judge found that
[g]ang evidence is admissible, despite the prejudice that attaches, if it is relevant and particularly if it is crucial in establishing motive. And the State, in my view has cobbled together sufficient *772 facts to warrant submitting to the jury this evidence on the issue of motive. And it's not a decision whether or not I would find that it clearly or convincingly establishes motive beyond a reasonable doubt. I don't think that that's a decision that I can come to. But I can say that a jurora reasonable juror could find it clear and convincing, and a reasonable juror could come to a conclusion beyond a reasonable doubt that there is evidence of motive in this case. So, I'm going to allow the evidence to come in.
As I indicated, the facts as testified by Miss Carney, in my view were very simple and straightforward. Number two, there was evidence that these folks were both members of rival gangs. Three, the site of the shooting was a Crip corner. Four, that the defendantthat the victim was a Blood on a Crip corner. And five, that the defendant in this case had expressed distress and/or anger over the fact that the victim had become a member of the Bloods.
So, I'm going to allow the State to introduce into evidence that issue and I will give a limiting instruction to the jury at the same time that the State indicates that it's going to introduce this evidence. And I guess I should really be dealing with that maybe in my initial instructions, because I guess that both counsel are going to want to address that in their opening statements, so I'm going to have to say something about it during the course of my initial instructions to the jury.
Counsel agreed upon the following language, which the judge used during jury selection.
During the trial, you'll hear references to an allegation that the decedent and the defendant were members of rival street gangs. It would be up to you to determine if that is true or not true and whether, if true, that has any relevance to a possible motive for the charges set forth in the indictment. I can tell you, however, that you can never use that evidence to conclude that defendant has a predisposition to commit any crimes or that simply because you find he was a member of a gang, he must be guilty of the crimes charged in the indictment. I'll tell you more about that later. Is there anyone here who believes that such evidence alone would make it difficult for you to be a fair and impartial juror?
In addition, the judge gave the following preliminary charge to the impaneled jury at the start of the trial.
Now, when we were selecting the jury in this case, I told you that during the course of the trial you will hear references to an allegation that the decedent, Rashon Bryant, and the defendant were members of rival street gangs. It will be up to you to determine if that is true or not true, and whether if it is true, that it has any relevance to a possible motive for the charges set forth in the indictment. I can tell you, however, that you can never use that evidence to conclude that the defendant has a predisposition to commit any crimes, or that simply because you find he was a member of a gang, or that the victim may have been a member of a gang ... the defendant, therefore, must be guilty of the crimes charged in the indictment.
In his final jury charge, after explaining the specific use for which the gang related evidence was admitted, the judge continued:
Whether this evidence does, in fact, demonstrate motive is for you to decide. You may decide that the evidence does not demonstrate motive and is not helpful to you at all. In that case, you must disregard it.

*773 On the other hand, you may decide that the evidence does demonstrate motive and you may utilize it for that specific purpose. However, you may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the defendant is a member of a street gang, or that the decedent was a member of a street gang, the defendant must be guilty of the present crimes. I have admitted this evidence only to help you decide the specific question of motive. You may not consider it for any other purpose and may not find the defendant guilty now simply because the State has offered evidence that he ... was a member of a street gang.
Goodman also sought to bar testimony about Goodman's letter to Jones and his statement to Carney at the Essex County Jail. The trial judge held Rule 104 hearings on those issues. He determined that there was sufficient credible evidence and allowed the testimony, citing State v. Rechtschaffer, 70 N.J. 395, 360 A.2d 362 (1976) ("Declarations subsequent to the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence or tend to establish intent are relevant and admissible.").
The judge also allowed introduction of Goodman's letter to Jones, once redacted to eliminate parts of the letter he found unduly prejudicial. Citing State v. Buhl, 269 N.J.Super. 344, 635 A.2d 562 (App. Div.), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994), and State v. Johnson, 216 N.J.Super. 588, 524 A.2d 826 (App.Div. 1987), the judge found that the letter was relevant to consciousness of guilt and determined that the prejudicial effect could be addressed by a limiting instruction.
He gave the following limiting instruction to the jury.
[T]here is for your consideration in this case a letter allegedly written by the defendant to Niem Jones. The State contends that this letter was written by defendant and constituted an effort by him to enlist the help of Mr. Jones to either harm or intimidate [Carney], an alleged witness to the shooting of Rashon Bryant. The questions of whether the defendant wrote the letter and if he did, whether he intended it to be an effort to enlist someone to harm or intimidate [Carney] are also questions of fact for your determination.
If you find that the defendant wrote the letter and intended it to be an effort to enlist someone to harm or threaten [Carney], then you may consider it in connection with all the other evidence in the case as an indication or proof of consciousness of guilt on the part of the defendant. On the other hand, defendant claims that reasonably read, the letter does not seek to enlist anyone to harm or intimidate the witness. If you find the defendant did not write the letter and/or that it was not intended to seek help in harming or intimidating the witness in this case, you should disregard the letter entirely.

C.
In addition to the fact witnesses mentioned above, the State presented additional fact and expert witnesses at the trial. Dr. Eddy Lilavois, an expert in forensic pathology, testified that Bryant's cause of death was multiple gunshot wounds, of which he found seven. Christopher Cosgrove, an investigator with the Essex County Prosecutor's Office, testified as a fact witness that shell casings and bullets were found at the scene, but that no guns were recovered. Lieutenant Dennis Hultay, Supervisor of the Essex County Sheriff's Office Ballistics Unit, testified that all *774 recovered shell casings were fired from the same type of weapon.
Lieutenant Earl Graves, who worked for the Prosecutor's Office as Supervisor of the Essex County-Federal Gang Partnership, was qualified as an expert on street gangs and testified concerning Bloods and Crips gang culture and rivalry. Graves testified that three scars from cigarette burns located on Bryant's shoulder were intended to signify a dog paw, which is a symbol used to identify Bloods members.
Ferrante testified about the circumstances surrounding his discovery of the letter from Goodman in Jones's cell. He acknowledged that his May 13, 2005, report about his search of the cell did not mention the letter. He testified that he wrote a subsequent report, in December 2005, about the finding of the letter. He further testified that the letter remained in his custody until he gave it to the homicide squad at the Essex County Prosecutor's Office on May 25, 2005.
The State presented two expert witnesses on the authenticity of the letter, Delores Coniglio, of the New Jersey State Police Office of Forensic Sciences, and William Davis, a forensic document examiner from the New Jersey Division of Criminal Justice. Davis testified to his conclusion that Goodman had written the letter. Coniglio, an expert in forensic DNA analysis, testified that Goodman's DNA was present on the adhesive portion of the envelope that contained the letter.
Jones testified for the defense that he is Goodman's first cousin and that Carney's best friend, Ebony, is the mother of his child. He acknowledged that he received the letter from Goodman, but made no attempts at hiding or destroying it. Jones was asked by the State to display a tattoo on the back of his neck that read "187 CK." Graves had testified that "187" represented the California police code for homicide, and that "CK" stood for "Crip killer."
Davon Smith, who had known Carney since 2002, testified for the defense that he had been an inmate at the Essex County Jail and witnessed the confrontation between Carney and Goodman. According to Davon Smith, Goodman said: "Why is you doing this to me? I love you like a sister. I loved him like a brother. You know I did not do this, please don't do this to me." Officer Larry Bellome, who had been in the vicinity of the holding cell on that day, testified for the defense that he had not overheard any threatening conversation.

D.
During her testimony, Angela Smith responded to a question about Goodman by stating that she knew him as "KB." She was asked whether she knew him by another name; and she responded: "Killa Blak."[3] Defense counsel objected to the mention of the name "Killa Blak," and moved for a mistrial. After satisfying himself that the reference was inadvertent, the judge denied the motion. He gave the jury the following curative instruction:
I want now to give you an instruction. I am striking the testimony of Ms. Smith with regard to an alleged nickname of Quran Goodman. And I want you to disregard the testimony of Miss Smith with regard to any alleged nickname of Quran Goodman, other than Blak. And I tell you right now that no nickname is evidence of guilt whatsoever.

*775 The use of a nickname, or any other kind of name, cannot and should not be considered by you for any purpose whatsoever, especially to show any predisposition on the part of defendant to commit a crime or to otherwise perform any bad act whatsoever. You must disregard that testimony with respect to any alleged nickname other than Blak. It is not evidence of anything and I am instructing you to disregard it. And in particular, and not without limitation, you are not to utilize any of that testimony whatsoever in any of your deliberations. It cannot be used by you.
Now, I understand that it's hard for somebody to say: Don't think of a pink elephant. And what I'm asking you to do, therefore, is while you might remember the testimony, I ask you to put it in a box. Put lines around it and you are not to utilize it for any purpose whatsoever in your ... decision in this case.
Mr. Goodman is presumed to be innocent and that presumption stays with him until the State has proven guilt beyond a reasonable doubt, if that is the conclusion that you come to at the end of this case. You cannot utilize this testimony in any way, shape, manner or form. If any of you feel that you're unable to abide by this instruction that I have now given to you, to disregard that testimony that I have now stricken, I need to know now. Is there anybody who feels that they can't abide by it? Anybody here feels that they would be unable to reach a fair and impartial verdict as a consequence of hearing testimony that I've stricken and now have given you an instruction with respect to? All right.
Let the record reflect that none of the jurors has responded affirmatively to that. And I'd like now for Miss Smith to be brought back into the courtroom and we will continue with our trial.

E.
Goodman requested the judge to instruct the jury as to the lesser-included offenses of aggravated manslaughter and reckless manslaughter. The State objected and the judge denied the request, citing State v. Hammond, 338 N.J.Super. 330, 768 A.2d 1069 (App.Div.), certif. denied, 169 N.J. 609, 782 A.2d 427 (2001). He explained that:
[t]he evidence, including the eyewitness accounts of the event, rationally supports no finding other than that [Goodman] acted deliberately and intentionally in causing [Bryant's] death. And there are a plethora of other cases, State v. Harris, 141 N.J. 525 [662 A.2d 333] (1995), finding no rational basis when the defendant fired a single shot into the victim's back and neck at close range.
As the Court in that case noted, but what purpose did the gunshot have, other than to kill? In State v. Biegenwald, 126 N.J. 1 [594 A.2d 172] (1991), again the Court found no rational basis for a lesser charge than murder when the defendant shot the victim four times in the head at close range. See also State v. Hightower, 120 N.J. 378 [577 A.2d 99] (1990); State v. Rose, 120 N.J. 61 [576 A.2d 235] (1990), finding no rational basis for a lesser included charge when the defendant fired a sawed-off shotgun into the victim's abdomen at close range.
Here, we have shots fired according to the witness at close range from a large caliber weapon, several of which were clustered in the chest and abdomen. I find no basis here, no rational basis to allow the jury to consider a charge of recklessness under circumstances manifesting extreme indifference to the value of human life, or plain reckless testimony. If they believe the witness's testimony, *776 the charge here is murder. If they don't believe the witness's testimony in this case, well then that's the end of the case with respect to the charge of homicide.

F.
On September 12, 2006, the jury returned a guilty verdict on all counts. On the day of Goodman's sentencing, the judge denied his motion for a new trial and reiterated his determination that the gang-related testimony was admissible. The judge then merged counts one and three, murder and possession of a weapon for an unlawful purpose, and sentenced Goodman to thirty years incarceration with parole ineligibility for the full term. The judge also sentenced Goodman to serve a concurrent four-year term for count two, unlawful possession of a handgun.
This appeal followed.

II.
Goodman raises the following issues on appeal:

POINT I: THE JURY HEARD SO MUCH INADMISSIBLE AND INFLAMMATORY TESTIMONY ABOUT DEFENDANT THAT IT WOULD HAVE BEEN IMPOSSIBLE FOR IT TO DECIDE THE CASE FAIRLY AND IMPARTIALLY. HENCE, DEFENDANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED, AND THE COURT ERRED IN DENYING DEFENSE COUNSEL'S MISTRIAL MOTION.
a. [Evidence of Goodman's] gang membership in a street gang.
b. [Evidence of Goodman's] alleged threats against Carney.
c. [Evidence of Goodman's] incarceration.
d. [Evidence of Goodman's] street name "Killa Blak."
....

POINT II: THE COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON ANY LESSER-INCLUDED OFFENSES OF MURDER.

A.
We turn first to the trial judge's evidential rulings. Our standard of review requires us to give "substantial deference to a trial [judge's] evidentiary rulings." State v. Morton, 155 N.J. 383, 453, 715 A.2d 228 (1998), cert. denied, 532 U.S. 931, 121 S.Ct. 1380, 149 L.Ed.2d 306 (2001). We review such decisions under "an abuse of discretion standard." State v. Burns, 192 N.J. 312, 332, 929 A.2d 1041 (2007). "[T]he decision of the trial court must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982).
The trial judge in this case appropriately held Rule 104 hearings, and his factual findings resulting from those hearings are also entitled to deference. State v. Robinson, 200 N.J. 1, 15, 974 A.2d 1057 (2009). Our review of the judge's purely legal conclusions, however, is plenary. State v. Handy, 412 N.J.Super. 492, 498, 991 A.2d 281 (App.Div.) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995)), certif. granted, 203 N.J. 95, 999 A.2d 463 (2010).

i.
Goodman first argues that the gang-related testimony was irrelevant. The contested gang-related evidence was properly admitted because the trial judge initially determined that it was relevant to *777 Goodman's motive. "`Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. To determine relevancy, a judge must focus
on the logical connection between the proffered evidence and a fact in issue. If the evidence offered makes the inference to be drawn more logical, then the evidence should be admitted unless otherwise excludable by a rule of law.
[State v. Darby, 174 N.J. 509, 519, 809 A.2d 138 (2002) (internal quotation marks and citations omitted).]
We are satisfied that the evidence with respect to gang membership offered in this case was relevant, because it explained why Goodman would shoot someone with whom he had been on friendly terms by demonstrating a motive for the shooting.
Goodman also contends that he was subjected to substantial undue prejudice because the evidence related to his gang membership amounted to evidence of "other crimes or wrongs" that, even if relevant, should have been excluded under N.J.R.E. 404(b). The State responds that the evidence was properly admitted for the purpose of showing Goodman's motive, which is an exception to the general exclusion of other-wrongs evidence under N.J.R.E. 404(b).
In addition, the State argues that gang membership should not be considered under N.J.R.E. 404(b) at all, and that analysis under N.J.R.E. 401 as to relevance and N.J.R.E. 403(a) as to undue prejudice is adequate. The State cites three reasons for its argument: (1) "[g]ang membership is not a crime," United States v. Acosta, 110 F.Supp.2d 918, 931 (E.D.Wis.2000) ("The First Amendment protects individuals' right of free association. Gang membership is not a crime."),[4]see also N.J.S.A. 2C:33-29; (2) gang membership is not proof of a crime committed by an individual member, State v. Johnson, 82 Conn. App. 777, 848 A.2d 526, 533 (2004) ("We conclude that the testimony regarding the defendant's gang affiliation did not constitute evidence of the defendant's prior misconduct because it did not show any bad act or criminal conduct on his part."); and (3) analysis under 404(b) could lead to unduly restrictive results because it requires "clear and convincing evidence." See State v. Cofield, supra, 127 N.J. at 338, 605 A.2d 230 ("The evidence of the other crime must be clear and convincing.").

a.
As a preliminary matter, we address the issue of whether the admission of evidence of gang membership under the circumstances of this case warrants analysis under the heightened standard of N.J.R.E. 404(b) as interpreted by Cofield.
The Supreme Court has held that "[o]ther crimes evidence is considered highly prejudicial." State v. Vallejo, 198 N.J. 122, 133, 965 A.2d 1181 (2009) (citing State v. Stevens, 115 N.J. 289, 309, 558 A.2d 833 (1989)). While evidence of past crimes or wrongs may be relevant, such evidence cannot be introduced to show a defendant's propensity towards criminal conduct, State v. Pitts, 116 N.J. 580, 602, 562 A.2d 1320 (1989), or that he is a "bad person in general," State v. Foglia, 415 N.J.Super. 106, 123, 1 A.3d 703, 714 (App. Div.2010) (citing Biunno, Current N.J. Rules of Evidence, comment 7 on N.J.R.E. 404 (2010)). "The risk involved with such *778 evidence is `that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself.'" Vallejo, supra, 198 N.J. at 133, 965 A.2d 1181 (quoting State v. G.S., 145 N.J. 460, 468, 678 A.2d 1092 (1996)).
In State v. Hernandez, 334 N.J.Super. 264, 269-70, 758 A.2d 1139 (App.Div.2000), aff'd as modified, 170 N.J. 106, 784 A.2d 1225 (2001), we explained the policy behind the exclusion of other-wrongs evidence as follows:
This rule of evidence, successor to former Evid. R. 55, is based on the common-law recognition of both the inordinate prejudice to the defendant inherent in other-crimes evidence and, at the same time, the utility of that evidence to the prosecution when it is fairly probative of defendant's guilt of the crime charged and not merely of his propensity to commit crime. Because of the "widespread agreement that other-crimes evidence has a unique tendency to turn a jury against the defendant...," State v. Stevens, 115 N.J. 289, 302 [558 A.2d 833] (1989), the compromise between the antagonistic interests that the Rule seeks to effect can be achieved only by the most delicate balancing. As Stevens, supra, at 303 [558 A.2d 833], explains, "[i]t is this inflammatory characteristic of other-crimes evidence that mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." The tension between undue prejudice to the defendant and probative value to the State to prove a fact legitimately in issue induced the Supreme Court in State v. Cofield, 127 N.J. 328, 338 [605 A.2d 230] (1992), to articulate further the conditions of admissibility of other-crimes evidence....
Although evidence of membership in a street gang is not, as the State argues, evidence of actual criminal activity, it is at the very least strongly suggestive of such activity. As the district judge noted in one of the cases cited by the State, Acosta, supra, 110 F.Supp.2d at 931, "[t]he mere fact, or even allegation, of gang membership carries a strong taint of criminality." We recently held in Foglia, supra, 415 N.J.Super. at 122-23, 1 A.3d at 713-14, that other-wrongs evidence need not involve actual criminal activity.
We conclude that N.J.R.E. 404(b) is applicable here because the average juror would likely conclude that a gang member has engaged in criminal activity. Such evidence has the potential to "taint" a defendant in much the same way as evidence of actual criminal conduct. Consequently, the evidence can only be used if the more demanding provisions of N.J.R.E. 404(b), as interpreted in Cofield, are satisfied.

b.
We now turn to the question of whether evidence of gang membership was properly admitted to prove motive in this case, applying the strictures of N.J.R.E. 404(b) and Cofield.
Appellate review of a trial judge's determination on the admissibility of "other bad conduct" evidence is one of great deference. Foglia, supra, 415 N.J.Super. at 122, 1 A.3d at 713. "Only where there is a `clear error of judgment' should the `trial court's conclusion with respect to that balancing test' be disturbed." State v. Marrero, 148 N.J. 469, 483, 691 A.2d 293 (1997) (quoting State v. DiFrisco, 137 N.J. 434, 496-97, 645 A.2d 734 (1994), cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996)). However, if the trial court admits evidence of other bad acts without applying the four-step Cofield *779 analysis, the trial judge's determination does not receive deference and the reviewing court reviews the issue de novo. Darby, supra, 174 N.J. at 518, 809 A.2d 138; Foglia, supra, 415 N.J.Super. at 121-23, 1 A.3d at 713.
The State cites federal decisions and case law from thirty-one states in which courts have found that evidence of gang membership is admissible for the purposes of showing motive at trials for murder and other crimes. See, e.g., Pole v. Randolph, 570 F.3d 922, 930-31 (7th Cir.), cert. denied, ___ U.S. ___, 130 S.Ct. 562, 175 L.Ed.2d 384 (2009); State v. Jackson, 186 Ariz. 20, 918 P.2d 1038, 1044, cert. denied, 519 U.S. 1015, 117 S.Ct. 527, 136 L.Ed.2d 413 (1996).
While acknowledging that our Supreme Court has not ruled specifically on the issue, the State points to State v. Torres, 183 N.J. 554, 569-71, 874 A.2d 1084 (2005), in which the Court outlined the case law in other jurisdictions that does allow such testimony. In Torres, the Court held that evidence about a defendant's gang involvement was admissible because it was "relevant to show the connection between defendant's actions as the leader of the gang and the actions of the other gang members who actually committed the murder."[5]Id. at 573, 874 A.2d 1084.
In a footnote, however, the Court stated,
[w]e observe that a number of state and federal courts have admitted gang expert testimony for the purpose of showing motive. Although we accept those cases as satisfying the test for reliability of gang expert testimony in the present case, we do not decide whether the expert testimony should be admissible to establish motive.
[Id. at 571, 874 A.2d 1084.]
We do not read the Court's observation that it was not deciding the issue as indicative of a disposition not to allow such evidence in the future.
N.J.R.E. 404(b) generally precludes the admission of evidence pertaining to other crimes or wrongs, except to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue of dispute." In Cofield, supra, 127 N.J. at 338, 605 A.2d 230, the Court set forth a four-factor test to govern the admissibility of such evidence for those purposes. The Cofield test requires that:
1. The evidence of the other crime must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.
[State v. Williams, 190 N.J. 114, 122, 919 A.2d 90 (2007) (citing Cofield, supra, 127 N.J. at 338, 605 A.2d 230).]
In Williams, however, the Court observed that the second Cofield factor "is not one that can be found in the language of Evidence Rule 404(b). Cofield's second factor, therefore, need not receive universal application in Rule 404(b) disputes." Id. at 131, 919 A.2d 90.
Our review of the record and the trial judge's decision convinces us that his decision *780 to admit the evidence should be affirmed. We have already stated our reasons for concluding that the evidence was relevant to the issue of motive, which satisfied the first Cofield factor. Goodman and Bryant were current gang members. Their meeting took place at a Crips corner, a place at which Goodman had previously complained about the visits of Bloods to drop off Carney. Consequently, we conclude that the substance of the second factor, if it is applicable, has been satisfied. The judge's determination that the evidence was clear and convincing was supported by the record, thereby satisfying the third factor.
Finally, we conclude that the fourth Cofield factor has been satisfied because the gang-related evidence explains Goodman's killing of Bryant despite their prior friendship. In addition to the testimony that Goodman and Bryant had been friends, there was testimony that, prior to his incarceration, Bryant had hung out and sold drugs at the corner without any protest from Goodman. The gang-related background explains why, after Bryant became a Blood, he was killed by Goodman when he returned to the corner of Ellis Avenue and Hopkins Place.
Consequently, the prejudice inherent in the revelation of Goodman's gang membership was outweighed by the probative value of the gang-related aspects of the relationship among Goodman, Bryant, and Carney in explaining why the events unfolded as they did. We know of no other evidence that could have been substituted for the gang-related testimony. See State v. Jenkins, 178 N.J. 347, 365, 840 A.2d 242 (2004) ("It is true that when motive or intent is at issue, we generally admit a wider range of evidence. Nevertheless, in deciding whether prejudice outweighs probative value, a court must consider the availability of other evidence that can be used to prove the same point." (internal quotation marks and citations omitted)).
Once evidence is found to be admissible, "[t]he court must instruct the jury on the limited use of the evidence." Cofield, supra, 127 N.J. at 341, 605 A.2d 230. "[T]he court's instruction `should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.'" Ibid. (quoting State v. Stevens, 115 N.J. 289, 304, 558 A.2d 833 (1989)).
The trial judge introduced the topic during the voir dire to ensure that prospective jurors who found such information prejudicial would be excluded, and then included appropriate limiting instructions during his charges to the jury. Goodman does not challenge the sufficiency of the judge's charges in this regard.

ii.
We next turn to the admission of testimony concerning Goodman's letter to Jones and his statement to Carney at the Essex County Jail. Goodman contends the evidence should not have been admitted because the content of the letter and the words of the statement were too ambiguous, in addition to being prejudicial. He also contends that, in admitting the evidence of his statement to Carney, the trial judge improperly allowed the jury to learn that he was incarcerated.
The State responds that the admission of the letter and the statement to Carney were proper because they were proof of Goodman's consciousness of guilt. It further argues that the fact of Goodman's incarceration was not unduly prejudicial because the judge took appropriate steps to limit undue prejudice.
*781 "Declarations subsequent to the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence or tend to establish intent are relevant and admissible." State v. Rechtschaffer, 70 N.J. 395, 413, 360 A.2d 362 (1976). In Rechtschaffer, the Supreme Court upheld the admission of an investigator's testimony that the defendant "advised that if he found out who the individual was that informed on him he would take his hunting knife and kill him." Id. at 401, 360 A.2d 362.
In State v. Buhl, 269 N.J.Super. 344, 364, 635 A.2d 562 (App.Div.), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994), we upheld the admission of a letter from the defendant to another inmate "requesting him to kill the victim in order to prevent her from testifying."
Our courts have long held that evidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt. See, e.g., State v. Johnson, 216 N.J.Super. 588, 611 [524 A.2d 826] (App.Div.1987) (no error by the prosecutor in attempting to establish that the witness was intimidated by defendant while both were incarcerated); State v. Hill, 47 N.J. 490, 500 [221 A.2d 725] (1966) (testimony that after trial began defendant accosted witness and threatened to kill him if witness took stand was admissible); State v. Lassiter, 197 N.J.Super. 2, 8 [484 A.2d 13] (App. Div.1984) (witness allowed to testify that he had been shot three days before defendant's case was scheduled for trial); State v. Plowden, 126 N.J.Super. 228, 231 [313 A.2d 802] (App.Div.) (testimony that after shooting, defendant said he would kill anyone who identified him), certif. denied, 64 N.J. 504 [317 A.2d 717] (1974). See also State v. Rivera, 232 N.J.Super. 165, 174 [556 A.2d 1227] (App.Div.) (defendant's attempt to marry girlfriend admissible as evidence of consciousness of guilt), certif. denied, 117 N.J. 169 [564 A.2d 885] (1989).
[Id. at 364-65, 635 A.2d 562.]
The admission of the evidence in Buhl was premised on application of Evid. R. 55, which was the predecessor of N.J.R.E. 404(b). However, Cofield is not mentioned in the Buhl opinion. Although the trial judge relied on Cofield in admitting the gang evidence, he did not cite that case with respect to the consciousness-of-guilt evidence at issue. Goodman does not argue that he erred in failing to do so.
Nevertheless, we address the issue because, especially with respect to the letter from Goodman to Jones, the State sought to have the jury infer that Goodman wanted Jones to take some action that would result in Carney's not testifying, which would potentially be a violation of N.J.S.A. 2C:29-3(b)(3) by Goodman.
As outlined above, Cofield, supra, 127 N.J. at 338, 605 A.2d 230, requires that other-wrongs evidence
must [1] be admissible as relevant to a material issue; ... [2] [be] similar in kind and reasonably close in time to the offense charged; ... [3] be clear and convincing; ... [and 4] [t]he probative value of the evidence must not be outweighed by its apparent prejudice.
The evidence at issue, the letter and the statement, was clearly relevant to demonstrate consciousness of guilt. To the extent it is applicable, the essence of the second Cofield factor is satisfied because the actions involved were contemporaneous and directly related to Goodman's prosecution for the offenses being tried.
We conclude that the evidence also satisfied the third factor, because there was sufficient proof that Goodman wrote the letter and that he spoke to Carney at the *782 jail. A fair reading of the letter to Jones, which had portions of Carney's statement to the police attached to it, clearly supports an inference that Goodman was seeking in some manner to influence Carney's availability as a witness. It may have been that Goodman wanted Jones to "reach out to those mean streets" to silence Carney in some way or it may be that, knowing that Jones was a Blood and had a relationship with Carney's best friend, he simply wanted word to get back to Carney that he was trying to do something to her.[6] As to the incident at the jail, if the jurors believed Carney's testimony about the nature of Goodman's statement, they could conclude that it was indicative of consciousness of guilt, even if it had not been intended as an actual threat.
Whether Goodman made the statement attributed to him by Carney and whether the letter and statement should be interpreted by the jury in the manner urged by the State was a matter for the jury. In Rechtschaffer, supra, 70 N.J. at 401, 360 A.2d 362, the Supreme Court held:
Although the remarks [that he would kill the informer] may also be interpreted as merely having expressed dismay at being unjustifiably incarcerated, they are consonant with an inference of an admission of guilt. It was properly the jury's function to determine the appropriate inference and the weight to be given to it.
Finally, we determine that the trial judge correctly determined that the probative value of the evidence outweighed the apparent prejudice. The judge ordered redaction of the letter to eliminate certain unnecessarily inflammatory matter and gave appropriate limiting instructions.

iii.
It would not, as a practical matter, have been possible to present the consciousness-of-guilt evidence, especially Goodman's statement to Carney, without allowing the jury to know that Goodman was in pre-trial detention. We have held that statements demonstrating consciousness of guilt are admissible in circumstances where the defendant was incarcerated at the time those statements were made, although the issue was not specifically discussed. Buhl, supra, 269 N.J.Super. at 364-65, 635 A.2d 562; State v. Johnson, 216 N.J.Super. 588, 611, 524 A.2d 826 (App.Div.), certif. denied, 107 N.J. 647, 527 A.2d 467 (1987). The trial judge gave an appropriate limiting instruction. We see no error or abuse of discretion with respect to the judge's decision on this issue.

iv.
Goodman argues that the trial judge should have granted his motion for a mistrial when Smith testified that she knew Goodman as "Killa Blak." The State responds that the curative measures taken by the trial judge were sufficient and that a mistrial was unnecessary.
A mistrial is an extraordinary remedy that should be used only to prevent a manifest injustice. State v. Winter, 96 N.J. 640, 646-47, 477 A.2d 323 (1984). The decision to grant or deny a motion for a mistrial is within the discretion of the trial judge. State v. Witte, 13 N.J. 598, 611, 100 A.2d 754 (1953), cert. denied, 347 U.S. 951, 74 S.Ct. 675, 98 L.Ed. 1097 (1954). Our scope of review of such a decision is limited to whether the trial court abused its discretion. Ibid.
*783 Although the State offers harmless interpretations of the name "Killa," there can be little doubt that the name was prejudicial and should not have been used. The trial judge took great pains to determine whether the use of the name was inadvertent or intentional. Having satisfied himself that the testimony was inadvertent and not invited by the prosecutor, he questioned the jury to determine the extent of any prejudice and gave a strong curative instruction.
Based upon our review of the record as a whole, we conclude that the trial judge acted appropriately and that he did not abuse his discretion in deciding to deny the application for a mistrial.

B.
Finally, we briefly address Goodman's argument that the trial judge improperly denied defense counsel's request to instruct the jury on the lesser-included offense of aggravated manslaughter. We find his arguments to be without merit and not warranting an extended discussion in a written opinion. R. 2:11-3(e)(2). We add only the following.
When a defendant requests the trial judge to charge a lesser-included offense, "the court is obligated to examine the record and determine whether a rational basis exists for the jury to acquit the defendant of the charged offense and convict him of the lesser offense." State v. Harris, 357 N.J.Super. 532, 539, 816 A.2d 171 (App.Div.2003). See also N.J.S.A. 2C:1-8(e); State v. Denofa, 187 N.J. 24, 42, 898 A.2d 523 (2006) ("[C]ourts are required to instruct the jury on lesser-included offenses only if counsel requests such a charge and there is a rational basis in the record for doing so or, in the absence of a request, if the record clearly indicates a charge is warranted.").
When requesting aggravated manslaughter as a lesser-included offense of murder, the evidence must allow "a finding that the defendant was aware of and disregarded a probability but not a practical certainty that his conduct would cause death." State v. Gaines, 377 N.J.Super. 612, 623, 873 A.2d 688 (App.Div.), certif. denied, 185 N.J. 264, 883 A.2d 1061 (2005). Having reviewed the record, we conclude that there was no rational basis for a charge of aggravated manslaughter, largely for the same reasons articulated by Judge Kennedy. The testimony was that Goodman shot Bryant as many as seven times at relatively close range. There was simply no basis for the jury to find that Goodman "was aware of and disregarded a probability but not a practical certainty that his conduct would cause death."

III.
In summary, we affirm the trial judge's determination to allow the gang-related testimony, the testimony concerning Goodman's letter to Jones, and the statement made by Goodman to Carney at the Essex County Jail. We further conclude that the judge took appropriate steps to limit any prejudice from the information, which was inherent in the testimony about the Goodman's interaction with Carney at the jail, that Goodman was incarcerated, and that he properly denied the motion for a mistrial because he took appropriate curative action with respect to the single, inadvertent use of the name "Killa Blak." Finally, we reject Goodman's argument that the trial judge should have charged aggravated manslaughter.
Affirmed.
NOTES
[1] Carney was incarcerated at the time of Goodman's trial and had additional charges pending against her. She testified the State did not make any promises relating to her pending charges in return for her testimony.
[2] "Slob" is a derogatory term that Crips use when referring to Bloods.
[3] In redacting the letter from Goodman to Jones, the judge had specifically redacted "Killa" because of its prejudicial connotation.
[4] With respect to gang membership, the United States Supreme Court has stated that a court "may not convict an individual merely for belonging to an organization that advocates illegal activity." United States v. Abel, 469 U.S. 45, 48, 105 S.Ct. 465, 467, 83 L.Ed.2d 450, 455 (1984) (internal quotation marks omitted).
[5] We note that the Supreme Court did not utilize N.J.R.E. 404(b) in analyzing the admissibility of expert testimony concerning gangs in State v. Torres, 183 N.J. 554, 580, 874 A.2d 1084 (2005). The focus of the Court's inquiry was the use of expert testimony about gangs under N.J.R.E. 702, rather than the admissibility of gang testimony in general.
[6] We note that Carney apparently knew about the letter prior to her encounter with Goodman at the Essex County Jail.