**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2248-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ARTESTE J. RUFFIN,
a/k/a ARTESTE RUFFIN,
ARTESE RUFFIN,
ARTESE J. RUFFIN, and
MAJOR L. RUFFIN,

    Defendant-Appellant.

_____

> Argued October 1, 2024 – Decided January 7, 2025
>
> Before Judges Gilson and Bishop-Thompson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 18-08-0682.
>
> Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Thomas M. Caroccia, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of third-degree conspiracy to commit aggravated assault, attempting to cause significant bodily injury, N.J.S.A. 2C:5-2 and 2C:12-1(b)(7). The conviction stemmed from the tragic death of then-eighteen-year-old, Amir Tarpley. The evidence tying defendant's involvement included video surveillance footage from New Street and a firehouse, and testimony from Aaron Hichox,[1] Archie Hichox, and Anthony Harden. The State also presented testimony from Paulsboro Police Department (PPD) Police Officer Nicole Greener, and Gloucester County Prosecutor's Office (GCPO) Detectives Micheal Bielski and Anthony Garabino regarding statements made by defendant.

---

[1] We refer to Aaron and his twin brother, Archie, by their first names because of their common surname. No disrespect is intended. The Hickox twins were charged with assault and weapons possession. Pursuant to a negotiated plea agreement in October 2019, the Hickox brothers pleaded guilty to simple assault with a maximum possible sentence of six months in jail for their involvement in Tarpley's death. Kishon Pierce pleaded guilty to Tarpley's murder.

We have reviewed the arguments presented, considered the record, and applicable law. We discern no abuse of discretion or error by the trial court and therefore we affirm.

I.

In August 2018, a grand jury indicted defendant for three crimes: third-degree conspiracy to commit aggravated assault, attempting to cause significant bodily injury, N.J.S.A. 2C:5- 2 and 2C:12-1(b)(7); second-degree conspiracy to commit aggravated assault, attempting to cause serious bodily injury, N.J.S.A. 2C:5-2 and 2C:12-1(b)(1); and first-degree conspiracy to commit murder, N.J.S.A. 2 C:2-6(a) and 2C:11-3(a). We glean these facts from the motion and trial record.

Before trial, the State moved for a Rule 104 hearing to admit four statements made by defendant. In this appeal, we focus on the two post-arrest statements made by defendant at the GCPO: the recorded booking statement and the recorded interview statement. The court noted defendant sought to suppress his booking and interview statements, although no formal motion to suppress had been filed.

Following argument, during which the booking and interrogation videos were played, the court granted the State's motion to admit defendant's two post-

arrest statements. The court found defendant made "unsolicited" and "spontaneous" statements during the booking process. While he was in custody, the trial court found that defendant was not subject to interrogation because the detectives were "not trying to question him," "did not engage in the functional equivalent of questioning," and based on their body language tried "to ignore" him. Accordingly, defendant's voluntary statements were admissible, were not made during a custodial interrogation and could be played to the jury.

As to the recorded interview statement, the court granted the State's motion in part, admitting defendant's statement and video up to point where defendant stated "well, I want a lawyer then." The court reasoned defendant waived his Miranda[2] rights and voluntarily gave a statement. The court also granted defendant's motion in part, finding he made an "unambiguous assertion of right to counsel," which required the interview to cease, and therefore, defendant's statement and the remainder of the interview was suppressed and would not be shown to the jury. The court ruled a redacted recording of defendant's formal interview could be played to the jury.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2248-22

Following a jury trial, defendant was convicted of third-degree conspiracy to commit aggravated assault.[3]  Defendant was sentenced to four years in prison and mandatory fines.  During the pendency of this appeal, on September 14, 2023, defendant was released from prison pursuant to the New Jersey Intensive Supervision Program.[4]

## II.

On May 20, 2018, then forty-two-year-old defendant encouraged teenager co-defendants Aaron, Archie, and Pierce to fight Tarpley.  Tarpley struck Kelly McCormick, defendant's girlfriend, after she struck Tarpley with a skateboard and her keys.

Aaron met defendant and McCormick at his mother's backyard in Paulsboro.  Defendant offered to pay Aaron forty dollars to "handle" Tarpley — "to go f*** [Tarpley] up."  Aaron called his twin brother, Archie, for "backup"; and in "less than five minutes," Archie and Pierce arrived at his mother's house.

---

[3]  At the close of the State's case, the court granted, in part, defendant's motion to dismiss the charges of second-degree conspiracy to commit aggravated assault and first-degree conspiracy to commit significant bodily injury murder. The court granted the defendant's motion for an acquittal on the murder and second-degree conspiracy charges.  Thus, only the third-degree conspiracy to commit aggravated assault was presented to the jury for deliberation.

[4]  The Intensive Supervision Program (ISP) permits certain state prison inmates to work their way back into the community under intensive supervision.

A-2248-22

The four walked toward Tarpley's house on New Street in Paulsboro. As they neared Tarpley's house, defendant urged them to split up to avoid suspicion. Defendant knocked on Tarpley's door and told him to come outside to fight Aaron.

Tarpley came outside and stood on the porch. Aaron taunted Tarpley. Tarpley stepped off the porch, and they fought. When Tarpley's friend, Anthony Harden, attempted to break up the fight, defendant punched him.

Tarpley ran into his house and stayed inside for only a "couple of seconds." The witnesses differed on the tool held by Tarpley when he came back outside. Archie testified that Tarpley came out of house with "two knives or whatever he had" and chased Aaron down the street. Aaron heard someone shout, "watch out, turn around," and saw Tarpley chasing him with a knife and a knife sharpener. Aaron ran toward a friend's driveway.

Aaron then wrestled Tarpley, and they "scrambled" on the ground. At some point, Tarpley was "engaged in combat" with Archie and Pierce. Tarpley attempted to stab Aaron but was blocked by Pierce's forearm. Aaron caught Tarpley's wrist, slammed it to the ground, and Tarpley dropped the knife. Pierce leaned forward, punched Tarpley, and started "punching" him in the chest.

6

After the fight, defendant told the Hickox twins that he was going to call McCormick. Shortly thereafter, McCormick picked them up and gave Aaron forty dollars from defendant.

## III.

On appeal, defendant raises the following arguments:

> POINT I: DEFENDANT'S REQUEST TO REPRESENT HIMSELF WAS IMPROPERLY DISMISSED WITHOUT THE APPROPRIATE INQUIRY. HIS CONVICTIONS MUST BE REVERSED.
>
> POINT II: DEFENDANT'S TWO STATEMENTS FOLLOWING HIS ARREST SHOULD HAVE BEEN SUPPRESSED. THEIR IMPROPER ADMISSION REQUIRES REVERSAL OF HIS CONVICTION.
>
> A. The Detectives' Questions Exceeded the Scope of the Limited Booking Exception to Miranda.
>
> B. Defendant Unambiguously Invoked His Right to Counsel.
>
> C. At Minimum, Repeated References to Defendant Contacting a Lawyer Should Not Have Been Played for the Jury.
>
> D. Detectives Improperly Contradicted the Miranda Warnings During the Formal Interrogation.
>
> E. The Improper Admission of Defendant's Statements Was Harmful Error.

A-2248-22

POINT III: THE COURT IMPROPERLY FAILED TO INSTRUCT THE JURY ON THE NECESSARY PURPOSEFUL MENS REA OF CONSPIRACY.

POINT IV: THE COURT IMPROPERLY FAILED TO INSTRUCT THE JURY THAT THEY HAD TO UNANIMOUSLY AGREE ON ALL ESSENTIAL ELEMENTS OF CONSPIRACY.

POINT V: THE NEAR-MAXIMUM CUSTODIAL SENTENCE IS EXCESSIVE FOR A FIRST-TIME OFFENDER LIKE DEFENDANT.

A. Aggravating Factor (1).

B. Aggravating Factor (3) and Mitigating Factor (9).

C. Aggravating Factor (6) and Mitigating Factor (7).

D. Aggravating Factor (9).

E. Mitigating Factor (3).

F. Mitigating Factor (10).

IV.

We review a trial judge's decision regarding self-representation for an abuse of discretion. State v. Outland, 245 N.J. 494, 507 (2021). A court abuses its discretion when its "decision [is] made without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis." United States v. Scurry, 193 N.J. 492, 504 (2008) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

"[T]he United States Constitution and our New Jersey Constitution grant defendants charged with a criminal offense the right to have the assistance of counsel." State v. King, 210 N.J. 2, 16 (2012) (citing U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). "The corollary to the right of a criminal defendant to be represented by an attorney is the defendant's right to represent himself." Ibid. (citing Faretta v. California, 422 U.S. 806, 814 (1975)).

Before defendant's request is granted, a trial court must engage in the two-step inquiry to determine if a defendant has knowingly and voluntarily waived his right to counsel in favor of proceeding self-represented. Outland, 245 N.J. at 506. "First, a defendant must assert the right of self-representation 'in a timely fashion' so as not to 'disrupt the criminal calendar, or a trial in progress.'" State v. Rose, 458 N.J. Super. 610, 626 (App. Div. 2019) (quoting State v. Buhl, 269 N.J. Super. 344, 362 (App. Div. 1994)). Second, trial courts must conduct a searching inquiry to inform defendants of the risks and pitfalls of representing himself. Id. at 627 (citing State v. DuBois, 189 N.J. 454, 468-69 (2007)).

Following the denial of defendant's motion to dismiss the indictment, defendant repeatedly interrupted and directly addressed both his attorney and the court, and engaged in the following colloquy:

> DEFENDANT: You didn't present him my letter I asked you to give him. Like, no one's doing nothing

they're supposed to do here, and I'm supposed to just be quiet and let everyone lie on me, right? Yeah, right. It's not going to happen. I would like to represent myself from here on out, Your Honor.

DEFENSE COUNSEL: Your Honor, I'll discuss with him that.

DEFENDANT: I would like to –

COURT: Please do.

DEFENDANT: -- represent myself here, Your Honor, from now on out.

COURT: We are done for today, [defendant]. If you want to make an application to represent yourself, you do so –

DEFENDANT: I am.

COURT: -- after consultation with [defense counsel].

DEFENDANT: I am not a bad guy, and I am so upset.

Thereafter, defendant did not file a motion to terminate his attorney and represent himself, nor did he make any further requests to represent himself at subsequent court proceedings. Rather, defendant continued to be represented after consulting with his attorney.

Defendant now argues that he is entitled to a new trial because he asserted his right to self-representation and the court failed to conduct a <u>Faretta</u> hearing. He further argues the trial court's failure to address his request to proceed as a

10

self-represented litigant constitutes "structural error" requiring reversal. We disagree.

Having reviewed the record, we hold the trial court's response to defendant was not a denial of his request of self-representation nor a "structural error." Here, defendant made a request while "upset" because he was dissatisfied with the court's ruling denying dismissal. The motion record shows the trial court did not explicitly deny defendant's request. After consultation with his attorney, defendant did not move to represent himself and he continued to be represented by counsel. Unlike the defendant in Outland, Rose, and Reddish, defendant's conduct during other pre-trial motions and at trial showed that he was not persistent in his request to proceed self-represented, thus waiving his right of self-representation. We, therefore, conclude there was no abuse of discretion by the trial court.

V.

We next address defendant's contention that the trial court erred in admitting his recorded statements made during booking and part of the formal interview.

A.    Unredacted Booking Statement.

11                                                    A-2248-22

Defendant argues the trial court erred in denying his motion to suppress his booking statement made at the GCPO. Second, he renews the argument that the "un-Mirandized" booking statement exceeded the scope of the booking exception to Miranda by interrogating defendant about the fight. Third, the booking video shows defendant unambiguously invoked his right to counsel; and should have been suppressed. Lastly, defendant's references to a lawyer should not have been played for the jury. Having reviewed the record, we reject defendant's contentions.

At trial, defendant objected to the video being played to the jury because he mentioned a lawyer three times during the booking process. The trial court overruled defendant's objection and reaffirmed its ruling from the Rule 104 hearing, finding that defendant's statements were voluntary, there was no interrogation, and the detectives were not required to stop and read defendant his Miranda rights when he referenced a lawyer.

While sitting on the bench waiting to be processed, defendant started talking about the fight. Defendant asked why he was at the station, and then stated, "I'[ve] got a lawyer coming. I [did]n't do nothing bro," to which Paulsboro Detective Minniti responded, "[t]hat's fine. Alright. That's fine."

Defendant repeatedly interrupted, proclaimed his innocence, claimed that he "defused the situation" and offered his cooperation, in between and over Bielski's booking explanation that defendant would be fingerprinted, given his Miranda rights, and then his statement would then be recorded. Again, defendant responded, "[a]ll right" and continued talking about the fight. Minniti then told defendant, "[l]et's not talk now."

Defendant continued to talk as Bielski obtained his biographical information. Bielski asked defendant if he knew Tarpley's brother and he said he did. Bielski did not ask defendant any other substantive questions. Detective John Petroski also asked defendant to listen to Bielski's instructions.

Defendant then asked Bielski and Petroski if he could call his girlfriend so he could "get the number to call this lawyer or something," and stated he would cooperate without being charged, "but if not," than he "better get a lawyer." Neither detective responded because they were focused on solving a technical problem with the photography software.

Defendant continued to proclaim his innocence as he was fingerprinted. Bielski told defendant that "a lot more evidence ha[d] come to light" since defendant's interview with Garbarino two days earlier. Defendant called the evidence "lies," repeated that he was innocent and made more statements. The

detectives made no further statements and did not ask defendant any substantive questions.

In reviewing a <u>Miranda</u> ruling, we "give deference to the trial court's factual findings so long as they are supported by sufficient credible evidence in the record." <u>State v. O.D.A.-C.</u>, 250 N.J. 408, 425 (2022) (citing <u>State v. S.S.</u>, 229 N.J. 360, 379-81 (2017)). The trial court's legal conclusions are subject to de novo review on appeal. <u>State v. Bullock</u>, 253 N.J. 512, 532 (2023) (citing <u>State v. Hubbard</u>, 222 N.J. 249, 263 (2015)). We will only reverse when the trial court's determination is "so clearly mistaken 'that interests of justice demand intervention and correction.'" <u>State v. Elders</u>, 192 N.J. 224, 244 (2007) (quoting <u>State v. Johnson</u>, 42 N.J. 146, 162 (1964)).

It is well settled that a person in custody must be advised of the rights guaranteed by the constitution before he or she is questioned. <u>Miranda</u>, 384 U.S. at 444. The protections of <u>Miranda</u> "'come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.'" <u>State v. Mallozzi</u>, 246 N.J. Super. 509, 514-15 (App. Div. 1991) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980)). "[B]ooking procedures and the routine questions associated [with that process] are ministerial in nature and beyond the right to remain silent." <u>State v. Bohuk</u>, 269 N.J. Super. 581, 593

14

(App. Div. 1994) (alteration in original) (quoting Mallozzi, 246 N.J. Super. at 515).

Here, defendant's contentions are not supported by the record. Throughout the booking process, defendant made "unsolicited" and "spontaneous" statements despite Bielski's repeated instructions to defendant that his Miranda warnings would be given before a formal statement was taken. Neither Bielski's testimony nor the video show defendant's statements were the result of a custodial interrogation. Accordingly, defendant's voluntary statements fall within the booking exception.

We also hold Bielski's statement to defendant that "a lot more evidence had come to light" was not tantamount to questioning or a "functional equivalent [that] was 'particularly evocative' or 'reasonably likely to elicit an incriminating response.'" State v. Tiwana, 256 N.J. 33, 42 (2023) (quoting Innis, 446 U.S. at 303). We are also satisfied that Bielski's question to defendant whether he knew Tarpley's brother was not a "targeted question," to attempt to cause defendant to incriminate himself. See id. at 43-44; Hubbard, 222 N.J. at 271-72.

Thus, we defer to the trial court's ruling that under the totality of the circumstances, defendant's booking statements were "voluntary in every way that [they] possibly can be." State v. Gonzalez, 249 N.J. 612, 647 (2022).

15                                                                    A-2248-22

Moreover, the trial court gave an instruction that the jury "must not consider for any purpose or in any manner in arriving [at] your verdict the fact that [d]efendant did not testify." Having reviewed the record, we discern no abuse of discretion, and we affirm the denial of defendant's motion to suppress statements made during booking.

Defendant next argues the booking statement should have been suppressed because he unambiguously invoked his right to counsel as shown in the booking video. That argument is not supported by the record.

When a suspect "'indicates in any manner and at any stage of the process that he or she wish[] to consult with an attorney before speaking[,] there can be no questioning.'" State v. Dorff, 468 N.J. Super. 633, 646 (App. Div. 2021) (quoting Miranda, 384 U.S. at 444-45). But, if a suspect makes an ambiguous assertion that is "'susceptible to two different meanings, the interrogating officer must cease questioning and 'inquire of the suspect as to the correct interpretation.'" State v. S.S., 229 N.J. 360, 382-83 (2017) (citation omitted); see also Gonzalez, 249 N.J. at 629.

However, "[n]ot every reference to a lawyer . . . requires a halt to questioning." Dorff, 468 N.J. Super. at 647. Each case is fact sensitive; so, a reviewing court must determine whether the "mention of counsel constitutes an

invocation of the right to counsel." Ibid. The reviewing court should consider the totality of the circumstances, "including all of the suspect's words and conduct." Ibid. (citation omitted).

As noted above, defendant's statements were not a product of a custodial interrogation. We hold defendant's fleeting statements regarding "a lawyer," "this lawyer," and wanting to call "this lawyer or something" were ambiguous and part of his voluntary stream of comments. Accordingly, clarification was not required since this was not a custodial interrogation. Instead, defendant continued to offer voluntary statements and did not expressly state that he wanted to speak with counsel. Nor was defendant's reference to a lawyer argued during opening statement, summations, or elicited during any witnesses' testimony. We, therefore, conclude the court properly exercised its discretion in admitting defendant's statements made during the booking video.

B.    Redacted Formal Interview Statement.

We next address defendant's contention that the trial court erred by failing to suppress the video recorded formal interrogation and permitted the redacted portion of the video to be played to the jury. At trial, defendant renewed his objection to the admission of the redacted formal interview video. The court overruled the objection, affirming its Rule 104 ruling.

Bielski's testimony supported by the video showed as the charges were being read to defendant, he attempted to "break it down" — describe the fight. Bielski interrupted defendant and re-read the Miranda rights to him from the Miranda form. After receiving his Miranda warnings, defendant waived his right and provided a video-recorded statement.

Defendant then made three attempts to negotiate a deal with detectives. First, defendant asked whether his charges would "go away" if he told Bielski and Minniti what he knew. Bielski told defendant he could not make any promises and stated: "the truth can only help your case." Defendant continued providing a statement while maintaining his innocence.

Second, when asked who stabbed Tarpley, defendant told the detectives: "Put it in writing that I get to leave today and just go free and I'll be your f****ing witness." Bielski restated that he could not make any promises, but said "cooperation gives you consideration."

In his last effort, defendant told the detectives that he would give "the f***ing truth," "[i]t goes away," and "[he] go[es] home. . . . Case closed." Bielski responded that it was "impossible" for him to offer defendant leniency in exchange for a statement. At that moment, defendant said: "Well, I want a lawyer then." The detective nevertheless continued with the interview.

"[T]rial courts should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel." State v. Feaster, 156 N.J. 1, 75 (1998). However, a trial court's failure to excise a defendant's references to counsel or provide a cautionary instruction "does not necessarily equate to reversible or plain error." State v. Tung, 460 N.J. Super. 75, 94 (App. Div. 2019).

Here, the record shows defendant unambiguously invoked counsel when it became clear the detectives were unable to negotiate a deal for him to go home. The trial court correctly suppressed and excised defendant's statement that he wanted a lawyer and the remainder of the interview, which was not played before the jury. Moreover, with no objection from defendant, the court instructed the jury on defendant's redacted recorded statement. The jury charge provided that "certain portion of the recorded statement was not provided and to only consider the portions of the statement admitted into evidence."

We are satisfied the trial court adhered to the principle of Feaster and provided the proper jury instruction. Feaster, 156 N.J. at 77. Therefore, we discern no reversible error in the admission of the redacted recorded formal interview statement and allowing the jury to view the video.

VI.

Defendant next raises, for the first time on appeal, the trial court improperly instructed the jury concerning the mens rea for conspiracy. Defendant argues the trial court failed to instruct the jury on the requirement of specific intent; rather the trial court permitted the jury to return a guilty verdict of conspiracy to commit aggravated assault if it found defendant acted knowingly or recklessly. We disagree.

At the charge conference, defendant made no objection to the jury charge; thus, we evaluate the alleged omission of the charge under the plain error standard. See State v. Santamaria, 236 N.J. 390, 404 (2019). In the context of a jury charge, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Montalvo, 229 N.J. 300, 320-21 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). "The error must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

"'[A]ppropriate and proper [jury instructions] are essential for a fair trial.'" State v. Cooper, 256 N.J. 593, 608 (2024) (alterations in original) (quoting State

20

v. Baum, 224 N.J. 147, 158-59 (2016)). "Proper jury instructions are 'crucial to the jury's deliberations on the guilt of a criminal defendant.'" State v. Cotto, 471 N.J. Super. 489, 542 (App. Div. 2022) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). "'The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law.'" Cotto, 471 N.J. Super. at 543 (alteration in original) (quoting Baum, 224 N.J. at 159).

Here, defendant's argument suffers from a fatal defect. The record shows the trial court charged the jury with Model Jury Charges (Criminal), Conspiracy (N.J.S.A. 2C:5-2) (rev. Apr. 12, 2010). A jury charge that follows the model jury charges is "presumed to be proper" because "the process to adopt model jury charges is 'comprehensive and thorough.'" Cotto, 471 N.J. Super. at 543 (quoting State v. R.B., 183 N.J. 308, 325 (2005)).

In charging the jury, the court explained that conspiracy to commit aggravated assault is separate from the crime of aggravated assault. The court further outlined the elements of conspiracy that the State must prove beyond a reasonable doubt. We hold the trial court properly instructed the jury on the elements of conspiracy, aggravated assault, and the requisite mens rea; and we therefore conclude there was no plain error.

## VII.

Defendant also raises for the first time on appeal, the trial court erred in not providing the jury with a specific unanimity instruction concerning the essential elements of conspiracy. Defendant's argument lack merit.

A jury must reach a unanimous verdict in a criminal case. See N.J. Const. art. I, ¶ 9; R. 1:8-9. To be unanimous, jurors must "'be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." State v. Macchia, 253 N.J. 232, 252 (2023) (quoting State v. Frisby, 174 N.J. 583, 596 (2002))

"Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict." State v. Cagno, 211 N.J. 488, 516 (2012) (quoting State v. Parker, 124 N.J. 628, 641 (1991)). An unanimity instruction, however, is required "in cases where there is a danger of a fragmented verdict." Id. at 517 (citing Frisby, 174 N.J. at 597-98). However, "in the absence of a specific request, the failure so to charge does not necessarily constitute reversible error." Parker, 124 N.J. at 637,

Again, defendant again did not object to the instruction either at the charge conference, during, or after the jury charge, so we review defendant's argument

under the plain error standard. There is nothing in the record to support defendant's contention that the jury would have been confused by the jury charge or there was danger of a fragmented verdict. The jury deliberated on only one charge — conspiracy to commit aggravated assault. With no requests to the court for clarification, the jury reached a unanimous verdict. Therefore, the trial court's general unanimity instruction was sufficient, and defendant failed to meet the plain error standard.

## VIII.

Lastly, defendant argues the trial court erred in sentencing him to a "near maximum" four-year prison term as a first-time offender. We reject defendant's argument.

An appellate court's standard of review of a sentence is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (citing State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a trial court's sentence unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

23

The sentencing transcript shows the court appropriately discussed and analyzed aggravating factors one, three, six, seven, and nine. The court did not find any mitigating factors. We discern no abuse of discretion in the court's determinations nor do we discern any reversible error.

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24